No. 2014-1475

# In the
# United States Court of Appeals
# for the Federal Circuit

SPEEDTRACK, INC.,

*Plaintiff-Appellant*,

v.

OFFICE DEPOT, INC., CDW CORPORATION, NEWEGG, INC., AND PC CONNECTION, INC.,

*Defendants-Appellees*,

CIRCUIT CITY STORES, INC. AND COMPUSA, INC.,

*Defendants*.

Appeal from the United States District Court for the Northern District of California
in No. 4:07-cv-03602-PJH, Judge Phyllis J. Hamilton

**OPENING BRIEF FOR PLAINTIFF-APPELLANT SPEEDTRACK, INC.**

Roderick G. Dorman
   *Principal Attorney*
Alan P. Block
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA 90017
Tel.: (213) 694-1200
Fax: (213) 694-1234
*rdorman@mckoolsmithhennigan.com*
*ablock@mckoolsmithhennigan.com*

Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Tel.: (214) 978-4014
Fax: (214) 978-4044
*dgeyser@mckoolsmith.com*

*Counsel for Plaintiff-Appellant*

No. 2014-1475

# In the
# United States Court of Appeals
# for the Federal Circuit

---

SPEEDTRACK, INC.,

*Plaintiff-Appellant*,

v.

OFFICE DEPOT, INC., CDW CORPORATION, NEWEGG, INC., AND PC CONNECTION, INC.,

*Defendants-Appellees*,

CIRCUIT CITY STORES, INC. AND COMPUSA, INC.,
*Defendants*.

---

Appeal from the United States District Court for the Northern District of California
in No. 4:07-cv-03602-PJH, Judge Phyllis J. Hamilton

---

## CERTIFICATE OF INTEREST

---

Counsel for Plaintiff-Appellant SpeedTrack, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

SpeedTrack, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> MCKOOL SMITH HENNIGAN, P.C.:  Roderick G. Dorman; Alan P. Block; Marc Morris; and Kevin I. Shenkman (formerly associated with firm; participated in trial court only)

> MCKOOL SMITH, P.C.: Daniel L. Geyser

Respectfully submitted.

/s/ *Daniel L. Geyser*

| | |
|---|---|
| Roderick G. Dorman | Daniel L. Geyser |
| *Principal Attorney* | MCKOOL SMITH, P.C. |
| Alan P. Block | 300 Crescent Court, Suite 1500 |
| MCKOOL SMITH HENNIGAN, P.C. | Dallas, TX  75201 |
| 865 South Figueroa St., Suite 2900 | Tel.:  (214) 978-4014 |
| Los Angeles, CA  90017 | Fax:  (214) 978-4044 |
| Tel.:  (213) 694-1200 | *dgeyser@mckoolsmith.com* |
| Fax:  (213) 694-1234 | |
| *rdorman@mckoolsmithhennigan.com* | |
| *ablock@mckoolsmithhennigan.com* | |

*Counsel for Plaintiff-Appellant Speed-Track, Inc.*

August 11, 2014

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

INTRODUCTION .....................................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE...................................................................4

SUMMARY OF ARGUMENT ................................................................15

STANDARD OF REVIEW .....................................................................20

ARGUMENT ..........................................................................................22

    I.    THE DISTRICT COURT'S RES JUDICATA FINDING IS INCOMPATIBLE WITH CONTROLLING LAW IN MULTIPLE RESPECTS ...................................................22

        A.    Defendants Cannot Satisfy Multiple Elements Of The Controlling Standard ................................................22

            1.    Walmart's Performance Of The Claimed Method Implicates Different Transactional Facts Than The Independent Activities Of These Separate Defendants ..................................................22

            2.    These Defendants Were Not Parties To The First Suit, And Privity Does Not Arise From A Standard Indemnification Agreement ...........................................26

        B.    Even If Res Judicata Somehow Applies, It Is Limited To The Precise Claims Adjudicated In *Walmart*, And The District Court's Contrary Holding Squarely Conflicts With Circuit Precedent...............................................33

    II.    THE COURT'S *KESSLER* RULING CREATES A CIRCUIT CONFLICT, UNDERMINES PRECLUSION DOCTRINE, MISREADS *KESSLER*, AND IMPERMISSIBLY DEPARTS

**TABLE OF CONTENTS**
**(continued)**

Page

FROM GENERAL LEGAL PRINCIPLES FOR PATENT
CASES ALONE .................................................................40

A.  The Supreme Court Displaced *Kessler* When It Decided
*Blonder-Tongue*, And This Court Then Revived *Kessler*
Despite Its Conflicts With Prevailing Law ..............................42

B.  There Are Compelling Reasons For *Kessler* And *Brain
Life* To Be Reconsidered By The En Banc Court.....................47

C.  Even If *Kessler* And *Brain Life* Survive, This Case Is
Readily Distinguishable—And There Are Compelling
Reasons Not To Extend *Kessler* Beyond Its Initial Scope .......52

CONCLUSION ........................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acumed LLC v. Stryker Corp.*, 525 F.3d 1319 (Fed. Cir. 2008)................. 20, 22, 36

*Allen v. McCurry*, 449 U.S. 90 (1980)........................................................ 44, 45, 50

*Americana Fabrics v. L & L Textiles, Inc.*, 754 F.2d 1524 (9th Cir. 1985) ...........38

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................... 21, 30

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348
   (Fed. Cir. 2013) ...........................................................................................21

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335 (Fed. Cir.
   2012).................................................................................................. *passim*

*Aspex Eyewear, Inc. v. Zenni Optical LLC*, 713 F.3d 1377 (Fed. Cir.
   2013)...........................................................................................................21

*Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045 (Fed. Cir. 2014).................... *passim*

*Cabrera v. City of Huntington Park*, 159 F.3d 374 (9th Cir. 1998) .......................39

*Cent. Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002)............22

*Comm'r v. Sunnen*, 333 U.S. 591 (1948)........................................................ 44, 47

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365 (2d Cir. 1997)................35

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) ...................... 37, 39

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ..............................................................49

*eBay v. MercExchange, LLC*, 547 U.S. 388 (2006) ......................................... 49, 51

*Foster v. Hallco Mfg. Co.*, 947 F.2d 469 (Fed. Cir. 1991) ....................................24

*Gen. Chem. Co. v. Standard Wholesale Phosphate & Acid Works, Inc.*,
   101 F.2d 178 (4th Cir. 1939)......................................................................52

*Gillig v. Nike, Inc.*, 602 F.3d 1354 (Fed. Cir. 2010)...................................... *passim*

*Global Maintech Corp. v. AIG Techs., Inc.*, No. 04-4638, 2006 U.S. Dist.
   LEXIS 11486 (D. Minn. Feb. 15, 2006) ................................................ 13, 31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Guild Wineries & Distilleries v. Whitehall Co.*, 853 F.2d 755 (9th Cir. 1988)................................................................................37

*Hallco Mfg. Co. v. Foster*, 256 F.3d 1290 (Fed. Cir. 2001) ....................................20

*Hansberry v. Lee*, 311 U.S. 32 (1940) ....................................................26

*Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683 (9th Cir. 2005)................................................................................37

*Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360 (Fed. Cir. 2000) ................. 22, 23

*Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (Fed. Cir. 1993) ....................................54

*L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 750 F.2d 731 (9th Cir. 1984)............................................................ 35, 38

*Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322 (1955)......................................35

*Manning v. City of Auburn*, 953 F.2d 1355 (11th Cir. 1992) .......................... 36, 39

*MGA, Inc. v. Gen. Motors Corp.*, 827 F.2d 729 (Fed. Cir. 1987) ................... *passim*

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007)..........................................55

*Nystrom v. Trex Co.*, 580 F.3d 1281 (Fed. Cir. 2009) .................................... 25, 37

*Optium Corp. v. Encore Corp.*, 603 F.3d 1313 (Fed. Cir. 2010) ...........................21

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) ..................................... 44, 50

*Richards v. Jefferson County*, 517 U.S. 793 (1996) ...............................................28

*Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co.*, 232 U.S. 413 (1914) ............................................................................. *passim*

*S. Snow Mfg. Co. v. Snowizard Holdings, Inc.*, No. 13-1586, 2014 U.S. App. LEXIS 12242 (Fed. Cir. June 30, 2014) ..............................................27

*Seim v. Hurd*, 232 U.S. 420 (1914)......................................................................54

*Selden Co. v. Gen. Chem. Co.*, 73 F.2d 195 (3d Cir. 1934)....................................51

*Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344 (Fed. Cir. 2014)..........................48

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*SpeedTrack, Inc. v. Endeca Techs., Inc. & Walmart.com USA, LLC*, 524 F. App'x 651 (Fed. Cir. 2013) ............................................................8

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186 (Fed. Cir. 2008) ...............21

*Taylor v. Sturgell*, 553 U.S. 880 (2008)............................................ *passim*

*Tech. Licensing Corp. v. Thomson, Inc.*, 738 F. Supp. 2d 1096 (E.D. Cal. 2010)...............................................................................................53

*Transclean Corp. v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298 (Fed. Cir. 2007) ..... 27, 31

*Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009)................21

*Webster v. Fall*, 266 U.S. 507 (1925) ......................................................39

*Wenborne-Karpen Dryer Co. v. Dort Motor Car Co.*, 14 F.2d 378 (6th Cir. 1926) .................................................................................53

*Woodward Co. v. Hurd*, 232 U.S. 428 (1914) ............................................54

*Young Eng'rs, Inc. v. U.S. Int'l Trade Comm'n*, 721 F.2d 1305 (Fed. Cir. 1983)........................................................................... *passim*

## Statutes

28 U.S.C. § 1295(a) ....................................................................2

28 U.S.C. § 1331 .......................................................................2

28 U.S.C. § 1338(a) ....................................................................2

28 U.S.C. § 2107(a) ....................................................................2

35 U.S.C. § 286 ........................................................................9

## Rules

Fed. Cir. R. 35 .......................................................................47

Fed. R. App. P. 4(a) ...................................................................2

Fed. R. Civ. P. 12(b)(6)...............................................................31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Fed. R. Civ. P. 23 ...................................................................................................17

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Plaintiff-Appellant SpeedTrack, Inc. respect-fully submits that:

(a) there have been no other previous appeals in this case; and

(b) there are no cases pending in this or any other court that will directly af-fect or be directly affected by this Court's decision in the pending appeal.

While SpeedTrack is unaware of any previous appeal in this case or any case "directly affected" by this appeal, this appeal is broadly related to (i) the previous appeal in *SpeedTrack, Inc. v. Endeca Techs., Inc. & Walmart.com USA, LLC*, Nos. 12-1319 & -1402, 524 F. App'x 651 (Fed. Cir. Apr. 16, 2013) (Dyk, Moore, & Wallach, JJ.) (unpublished); and (ii) the pending action in *SpeedTrack, Inc. v. Amazon.com, Inc., et al.*, No. 09-CV-4479-JSW (N.D. Cal.).

**INTRODUCTION**

In its decision below, the district court found that SpeedTrack's infringement claims were precluded by a prior lawsuit. Yet *none* of SpeedTrack's claims for infringement under the doctrine of equivalents—the only infringement claims being asserted—has ever been decided in any proceeding. These claims were immune under any ordinary application of collateral estoppel and res judicata. Had they arisen in any other circuit, they would have been authorized to proceed.

Yet the district court, applying this Circuit's law, held that the claims were barred by res judicata and in addition were barred under the so-called *Kessler* doctrine—an obsolete proxy for defensive collateral estoppel developed long before the Supreme Court's modern jurisprudence (and *Blonder-Tongue* decision) occupied the field. The district court's decision was incorrect. It implicates core questions concerning the scope of res judicata, the applicability of the *Kessler* doctrine, and *Kessler*'s viability under a modern preclusion analysis. It ignores the Supreme Court's *Rubber Tire* exception to the *Kessler* doctrine. The court's ruling, if allowed to stand, will leave the Federal Circuit out of step with every other circuit's application of preclusion in every non-patent context. While this case can be resolved without addressing the Federal Circuit's recent resuscitation of *Kessler*, this appeal also presents a suitable vehicle for revisiting that issue.

The district court's judgment was flawed, and it should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and this Court has jurisdiction under 28 U.S.C. § 1295(a). The notice of appeal was filed on May 8, 2014, after final judgment was entered on May 6, 2014. Under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a), SpeedTrack's appeal is timely.

## STATEMENT OF THE ISSUES

1. a. Whether, for res judicata, two claims arise out of the same "transactional facts"—despite involving independent parties, distinct activities, and different users, methods, websites, software, and time periods—simply because each party happens to use the same brand of technology in "essentially the same" way.

b. Whether, due solely to a standard indemnification, all customers are automatically bound by a judgment in the manufacturer's earlier litigation, even though (i) the customers were not parties to that litigation, and (ii) the indemnification agreement disclaims "*any*" representative or agency capacity and expressly preserves the rights of each customer to participate separately in its litigation.

2. Whether (i) res judicata automatically bars all claims arising after the filing of a complaint but before final judgment, even if those claims were never raised or resolved in earlier litigation (as the court held below), or instead (ii) res judicata does not bar "the assertion of 'new rights acquired during the [earlier] ac-

tion which might have been, but were not, [actually] litigated'" (as this Court has held multiple times).

3. a. Whether the so-called *Kessler* doctrine—an old proxy for collateral estoppel during "the heyday of the federal mutuality of estoppel rule"—precludes future infringement litigation once an accused process is declared non-infringing, even though that litigation survives under modern preclusion principles, *Kessler* conflicts with the law of every other circuit, and the doctrine would stand as an impermissible patent-specific exception to generally applicable legal principles.

b. Whether, pursuant to *Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co.*, 232 U.S. 413 (1914), a software manufacturer's judgment of non-infringement protects its customers from method claims, even though the software manufacturer only supplied software, and the methods are practiced when customers combine that software with a host of user-specific hardware, software, and data not provided by the software manufacturer.

## STATEMENT OF THE CASE

### The '360 Patent Introduces A Revolutionary Approach To Searching

Professor Jerzy Lewak[1] and his co-inventors conceived of an invention that permits an end user to search for and locate files stored in a computer system using predefined, descriptive categories associated with the stored information. [4:5-28].[2] Professor Lewak's invention overcame two problems plaguing the prior art: mistypes and null results. Mistypes are precluded by the use of a "pick list" of search terms presented to the end user. Null results are addressed by ensuring both that each of the search terms ("category descriptions") presented to the end user correspond to at least one positive result, and that, with each successive choice by the user, unwanted files and category descriptions having no matching files are eliminated from the search. This makes it impossible to search for an unavailable item and every search is thereby guaranteed to produce a positive result.

Professor Lewak's invention is implemented using three structures:

---

[1] Professor Lewak holds a B.S. and Ph.D. in theoretical physics from the University of Manchester in England, and is a Professor Emeritus in the Department of Electrical and Computer Engineering at the University of California at San Diego. He is also the founder of Nisus Software, Inc. where, in 1989, he designed one of the earliest word processing programs for the Apple Macintosh.

[2] These citations refer to the column:line numbers of the '360 patent. Thus, for example, the reference "4:5-28" refers to Column 4, Lines 5-28 of the '360 patent. The '360 patent is reproduced at A20-A34.

First, "category descriptions" are defined and stored in the computer system in a structure called a "file category table" or a "category description table." [5:2-6:15; Fig. 3]. Preferably, the "category descriptions" in the "category description table" are both a human-understandable (alphabetic) name[3] and an associated computer-generated (numeric) identifier. [5:6-20; 5:40-60; 9:11-21; Fig. 3]. Once associated, the alphabetic and numeric identifiers mean exactly the same thing to the computer. The specification thus treats the associated alphabetic and numeric names—both collectively and individually—as the relevant "category descriptions," depending on whether the name is being used principally by the computer or by the end user.

Second, a "file information directory" is created and stored in the computer system. [6:16-7:19; 9:11-40; Fig. 4]. The "file information directory" contains information linking the "category descriptions" to specific files stored in the system. [4:58-62]. In contrast to the "category description table"—which always contains the human-readable (alphabetic) names—the "file information directory" preferably contains only the associated numeric category names. [*Compare* Figs. 3 and 4; 5:4-60; 6:17-32; 9:11-40]. In particular, each entry of the "file information directo-

---

[3] The "human-understandable (alphabetic) names" can be alphabetic (*e.g.*, "Memos"), can be numeric (e.g., "2011-2012"), or can be alphanumeric (*e.g.*, "Size 8"). There is no limitation in the specification excluding numeric or alphanumeric names.

ry" preferably contains a unique identifier for a file and a set of the unique identifi-

ers for the "category descriptions" selected from the "category description table."

[6:17-32; Fig. 4]. Again, the specification describes this set of unique numeric

names as "the associated category description(s) for the file." [10:17-18].

Third, a "search filter" is created in the computer system comprising "cate-

gory descriptions" selected by the end user along with a logical operator such as

"AND" or "OR." [10:37-11:10]. The search filter is used to search through the en-

tries of the "file information directory" to locate those files that have "category de-

scriptions" matching those in the search filter. [10:54-60]. Matching "category de-

scriptions" are located by the computer system using the unique numeric identifi-

ers. [12:32-13:12].

In the preferred embodiment, the human-understandable (alphabetic) expres-

sion of the "category descriptions" are only used when a user is interacting with

the system—when inputting new "category descriptions" to the "category descrip-

tion table," associating files with "category descriptions," and searching for files

by selecting "category descriptions" for the files to be located—whereas the asso-

ciated, computer-generated (numeric) expressions of those "category descriptions"

are used only by the computer when the search filter searches the numeric expres-

sions of the "category descriptions" in the "file information directory" to locate

matching files and matching "category descriptions." Again, this makes sense: end

users are interacting with the "category description table," and the computer is interacting with the "file information directory."

On August 6, 1996, the PTO awarded Professor Lewak and his co-inventors the '360 patent on their inventive search method and system inventions.

### Representative Claim 1 Of The '360 Patent

Representative claim 1 of the '360 patent claims "a method for accessing files in a data storage system of a computer system" and comprises three successive method steps for creating each of the three structures described above. In the first step, a "category description table" is created containing "a plurality of category descriptions, each category description comprising a descriptive name." In the second step, a "file information directory" is created wherein each entry corresponding to a stored file comprises "at least a unique file identifier for the corresponding file, and a set of category descriptions selected from the category description table." In the third step, a "search filter" is created "comprising a set of category descriptions."

### The Prior *Walmart* Litigation

Before filing the present action, SpeedTrack sued Walmart USA, Ltd. (and others) for infringing the '360 patent. A1798. Endeca Technologies, Inc. would later intervene. A1806. Endeca provided Walmart certain software that Walmart used to create the alleged "category description table," "file information directory,"

7

and "search filter" structures. SpeedTrack counterclaimed against Endeca for indirectly infringing the '360 patent. A1806. This marked the last claims filed in the *Walmart* action; SpeedTrack never supplemented its pleadings, filed a superseding complaint, asserted additional infringement, or sought additional damages based on any infringing acts arising after its complaint was filed.

The *Walmart* court granted summary judgment of noninfringement, based on the fact that the "category description" limitation was not literally met where the computer system used numbers (not alphanumeric category descriptions) in connection with its file information directory; it further denied SpeedTrack's motion for leave to assert that the limitation was met under the doctrine of equivalents. A1490. SpeedTrack appealed both decisions to the Federal Circuit, which affirmed on both grounds. *SpeedTrack, Inc. v. Endeca Techs., Inc. & Walmart.com USA, LLC*, 524 F. App'x 651 (Fed. Cir. 2013).

Because the *Walmart* defendants had actively opposed SpeedTrack's efforts to introduce issues under the doctrine of equivalents, that issue was not litigated in the *Walmart* action; the final judgment in the case specifically recites that the basis for non-infringement was limited to the reasons articulated in the court's summary judgment opinion, *i.e.*, literal infringement. A1497, A1515.

### This *Office Depot* Litigation

SpeedTrack filed its original complaint in this case on July 12, 2007 (A1817) and filed its First Amended and Supplemental Complaint on June 28, 2013 (A1733). In its amended complaint, SpeedTrack alleged that each Defendant infringed the '360 patent by practicing the claimed methods between July 12, 2001 (six years before SpeedTrack's original complaint, *see* 35 U.S.C. § 286) and the filing of the First Amended Complaint on June 28, 2013. A1736, A1739, A1742, A1744-A1745. Each asserted claim is a method claim (independent claims 1 and 20).

After the Federal Circuit affirmed in *Walmart*, SpeedTrack represented to the *Office Depot* court that it would limit its claims to infringement under the doctrine of equivalents, assuming discovery confirmed that Defendants used numeric identifiers in their "file information directories." A179-A180.

After Defendants indicated an intent to seek dismissal under res judicata and collateral estoppel, SpeedTrack sought and obtained limited discovery to examine Defendants' accused methods. A230. In the course of that discovery, Defendants resisted disclosing their indemnification agreements, explaining that indemnification was irrelevant to their preclusion defenses. When each Defendant produced its agreement, it redacted all of the provisions except for a single provision (Section 9) outlining the terms of the indemnification. *See, e.g.*, A702-A704.

After discovery, Defendants formally moved to dismiss. Consistent with their prior representations, Defendants insisted that indemnification was irrelevant and asserted privity based on the mere fact that Defendants were Endeca customers. A290-A291. Once SpeedTrack opposed on the ground that a customer relationship was insufficient, Defendants switched positions and finally sought to introduce redacted versions of their indemnification agreements. A701-A716. SpeedTrack objected to Defendants' effort to lodge a new argument on reply, and filed a motion to strike the agreements. A786.

At the hearing on Defendants' motion, the court determined that the issues were more appropriate for disposition on summary judgment. A866. The court accordingly authorized a brief period of discovery and ordered a new briefing schedule for the Rule 56 filings. A866, A867-A868. As part of this discovery, SpeedTrack was finally able to obtain unredacted copies of the indemnification agreements. A1377-A1420. The unredacted versions revealed that Defendants expressly disclaimed any representative or agency relationship: "[n]othing contained in this Agreement shall be deemed to imply or constitute that either Party is the agent or representative of the other Party, or that both parties are joint ventures or partners for any purpose." *E.g.*, A1420.

SpeedTrack's discovery also uncovered how each Defendant's accused activities were different from the accused activities in *Walmart*. While these Defend-

ants used Endeca's software,[4] they did not use that software alone to practice the accused methods. Defendants instead used Endeca's software in combination with other software (not provided by Endeca), and each Defendant used its own hardware and data to create the alleged "category description table," "file information directory," and "search filter." This level of customization distinguished each Defendant's practices from those at issue in *Walmart*. (In fact, Defendants even run different versions of the software.[5])

Moreover, the record showed that Endeca's software did nothing by itself. Without individual implementation, the software could not allow an end user to navigate or search for products on a website. A1126-A1127; A1140-A1144. To operate properly, each Defendant was required to install the software on its own hardware and operate it using each Defendant's unique data. A1124-A1126; A1140-A1144; A1159-A1163; A1169. Each Defendant again implemented Endeca's platform its own way,[6] leading to practices different from those in *Walmart*.[7]

---

[4] Endeca was recently purchased by Oracle, but that acquisition is not relevant to this case or this appeal.

[5] PC Connection first used Endeca version 3.2 or 3.3 and now runs version 6.1.4. A1128-A1129. Newegg currently uses version 6.3.5. A1132-A1133. Office Depot first used version 4.6 and now runs version 6.1. A1152. CDW first used version 3.4 and now runs version 6.2. A1166-A1167.

[6] For example, Defendant Newegg creates its own Dimension Value IDs (the numerical identifiers) (A1137-A1139), whereas other Defendants do not.

In response to this evidence of unique use, each Defendant submitted a declaration with the same stock language: "To my knowledge, [Defendant] does not change the format of the identified numeric fields in the Endeca file(s) identified above to be anything other than number." A1029, A1040, A1050, A1057. These statements reference a file in non-human readable format (A1029, A1040, A1050, A1057.), preventing these employees from knowing what the software actually does or what the file contains (A1120-A1122; A1134-A1136; A1153-A1158; A1168.).

**The District Court Grants Summary Judgment**

In accordance with the court's schedule, all Defendants moved for summary judgment, maintaining that, in light of the *Walmart* action, SpeedTrack's suit was

---

[Footnote continued from previous page]

[7] A simple example highlights select differences between each Defendants' implementation of Endeca's software. Each Defendant sells the identical product on its website: a Western Digital 1 TB portable hard drive, WDBK8A0010BBK-NESN. Using different versions of Endeca's software, each Defendant uses different hardware, software, and data to create its own *unique* product record for that same hard drive—with different "PROP NAMEs" (*i.e.*, property names), "PVALs" (*i.e.*, property values)," DIMENSION_IDs," and "IDs." A1171-A1270. These differences reflect the differences in each Defendant's individual practice. Further, end-users navigate to that same hard drive differently on each Defendant's website. A1271-A1308. Finally, screen shots of Walmart's website, submitted in the *Walmart* action, show that Walmart's navigation functionality varied from Defendants' methods here. A1316-A1328.

precluded by res judicata, collateral estoppel, and the *Kessler* doctrine (*see Kessler v. Eldred*, 206 U.S. 285 (1907)).[8]

The court granted Defendants' motion based on *res judicata* (in part) and the *Kessler* doctrine (in full), but held that collateral estoppel did not apply. A1-A16. Specifically, the court held that *res judicata* applied for certain periods at issue. It found that Defendants were in privity with Endeca (a party from the *Walmart* action) because they were all Endeca customers and were indemnified by Endeca. A10-A11 (relying on *Global Maintech Corp. v. AIG Techs., Inc.*, 2006 WL 354224 (D. Minn. 2006)). The court thus held that Defendants were protected by Endeca's judgment, and that SpeedTrack could not assert infringement against Defendants for acts occurring prior to March 30, 2012, the date judgment was entered in *Walmart*; according to the court, res judicata did not cover any acts occurring after that date, but did cover all acts predating the final judgment. A7-A12.

The court, however, separately held that the *Kessler* doctrine precluded "the entirety of SpeedTrack's suit." A16. As the court understood *Kessler*, "[b]y virtue of [the *Walmart* action], the accused Endeca technology acquired the status of a

---

[8] In moving for summary judgment, Defendants again switched positions. For example, Defendants originally maintained that the *Kessler* doctrine was "recognized as a theory of 'defensive collateral estoppel' that is unique to the patent infringement context (A300); in their summary-judgment motion, however, Defendants maintained that *Kessler* was an extension of *res judicata*: "[t]he Supreme Court has extended res judicata in patent cases (in its *Kessler* decision)." A875.

non-infringing product." SpeedTrack, the court held, thus "lost the right to assert any claims of the '360 patent against any customers of Endeca who use the accused software in 'essentially the same' manner as did Wal-Mart." A15. Because the court found that "Defendants have shown that they do indeed use the [Endeca] software in 'essentially the same' way," the entire suit was "barred by the *Kessler* doctrine." A15-A16.

Despite granting judgment for Defendants, the court expressly rejected Defendants' efforts to invoke collateral estoppel. A12. This action, unlike the *Walmart* action, involves only infringement under the doctrine of equivalents, not literal infringement. As the court explained, the *Walmart* action found no *literal* infringement, but "the issue of infringement under the *doctrine of equivalents* was not 'actually litigated.'" *Ibid.* (emphasis added). Because collateral estoppel only applies to issues that were "actually litigated," *Walmart* did not foreclose "Speed-Track's claims that defendants infringed the patent-in-suit under the doctrine of equivalents." *Ibid.*

The court's ruling resolved all of SpeedTrack's claims, and the court entered final judgment in favor of Defendants that same day. A17. SpeedTrack filed its notice of appeal on May 8, 2014. A1989-A1990.

## SUMMARY OF ARGUMENT

Contrary to the district court's contention, SpeedTrack's lawsuit is not barred under any proper application of any legitimate preclusion doctrine. The district court misapplied the settled rules of res judicata, and it wrongly invoked the *Kessler* doctrine, which is inapplicable on these facts and (in any event) obsolete. The court's holding, if allowed to stand, deepens a direct conflict with multiple circuits over critical issues of preclusion. It bars a suit that would proceed in any other circuit in non-patent cases—threating again to leave this Court in the position of crafting patent-specific exceptions to legal principles of general applicability.

The district court's conclusion is clearly wrong, and SpeedTrack's lawsuit, in full, was entitled to proceed. The judgment below should be reversed.

1. a. Defendants failed to satisfy multiple elements of the controlling res judicata test.

First, according to the district court, this litigation and the *Walmart* litigation involve the same transactional facts because each accused party uses the same Endeca technology in "essentially the same" way. This fundamentally misunderstands the "transactional facts" requirement. The fact that two wholly independent parties may separately replicate the same infringing acts—at different times and locations, for different purposes, using different hardware, software, and data—does not somehow convert two obviously different events into a single occurrence. The

*Walmart* action focused on Walmart's particular infringing activities; there was no basis for SpeedTrack to focus on the *Walmart* defendants (and, again, *Walmart's independent conduct*) and assert claims seeking to hold Walmart and Endeca responsible for the acts of Walmart's competitors.

The court's contrary view was short on law and logic. The "essentially the same" standard has no application where claims are plainly distinct for other reasons. For res judicata purposes, it may be *necessary* to show that a targeted claim is "essentially the same" as a claim from an earlier suit, but it is not *sufficient* to show that both claims arise from the same transactional facts.

SpeedTrack was not required to sue every single independent entity in the same suit who happens to practice the claimed method in the same way. The defendants in this suit are Walmart's *competitors*; SpeedTrack could not have sued Walmart for the independent actions of Office Depot, CDW Corporation, Newegg, or PC Connection simply because they all happen to practice the method (with their own software, hardware, and data) using Endeca software.

Each defendant infringes the patent by performing the claimed method on its own; no matter how closely one performance resembles the other, each gives rise to a separate and distinct "cause of action." Res judicata does not apply.

Second, the district court determined that Defendants and Endeca were automatically in privity because Endeca had agreed to indemnify its customers in the

event any were sued for infringement. There is no such thing as an "indemnification" exception to the strong presumption against nonparty preclusion. The court neglected even to cite the Supreme Court's authoritative decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008) (opting instead to focus on a *pre-Taylor* unpublished disposition from the District of Minnesota). Yet *Taylor* confirms that there is no "adequate representation"—a term of art—unless Defendants' interests were clearly represented in a formal way in the earlier suit (think, *e.g.*, Rule 23 class actions). Here, however, Defendants have only an indemnification agreement addressing Endeca's obligations to Defendants if *Defendants themselves* are sued; it nowhere suggests that Defendants are bound in a separate suit, as in *Walmart*, involving Endeca and other customers.

Worse yet, Defendants *redacted* the agreements to conceal the clause where Defendants and Endeca *specifically agreed that Endeca was not representing any customer for "any" purpose*. These defects are dispositive, and there is no privity.

b. Even if res judicata were somehow appropriate, the district court erred in blocking out any claims that arose before the *Walmart* judgment was entered. It is settled law that res judicata only bars the precise set of claims adjudicated in the earlier action. Where a plaintiff thus elects against putting post-complaint conduct at issue, any claims accruing during the course of the litigation are spared for future suits.

Those claims may be subject to *collateral estoppel* defenses, to the extent a future suit seeks to relitigate the identical issues resolved in the first action. But res judicata is a specific defense; it is limited to the *adjudication of claims*, and a claim withheld from an action is not a claim adjudicated in that action. If the district court's res judicata decision is upheld at all, it should be cut back to foreclose only those claims that arose on or before SpeedTrack filed its operative counterclaims.

2. The district court erred in dismissing the entirety of SpeedTrack's complaint under the *Kessler* doctrine. After not applying *Kessler* for nearly three decades in any published opinion, the *Brain Life* panel revived the doctrine to bar claims that would have survived under any circuit's application of claim or issue preclusion in any non-patent context.

*Kessler* had a legitimate role in the days when customers could not assert defensive collateral estoppel to avoid relitigating issues that were squarely resolved in earlier suits. But *Kessler* has no role under the Supreme Court's modern jurisprudence. The Supreme Court eliminated the roadblocks to defensive collateral estoppel in *Blonder-Tongue*, and there is no indication that the Court intended *Kessler* to survive, much less to sweep past the limits on issue and claim preclusion to bar suits that (according to the Supreme Court) should proceed. The Supreme Court's modern preclusion doctrine occupies the field. As a result of *Brain Life*'s

revival, *Kessler* now frustrates that doctrine by imposing unique rules in patent cases alone.

Nor is there any basis for holding that *Kessler* reflects a specific doctrine of substantive patent law. While the case arose in a patent dispute, the Court's rationale was not linked to patent cases alone. It did not once cite any provision of the Patent Act or describe any single consideration unique to patent cases. There is simply no indication, anywhere, that the Court understood *Kessler* as announcing a new substantive doctrine that required a patent-specific set of preclusion principles.

Preclusion turns on generally applicable principles, and those principles apply generally across all areas. There is no basis now for presuming that *Kessler* stands alone to create a square conflict with the ordinary rules of claim and issue preclusion in every other circuit. *Brain Life* should have left *Kessler* where it was, and the district court erred in picking up *Brain Life* and extending *Kessler* where it had never been—applied by *customers*, not the manufacturer, to bar new claims and legal issues that had never before been litigated in any court. That district court's decision is fundamentally unsound, and it should be rejected.

In any event, *Kessler* has been inapplicable on these facts for (literally) a full century. In *Rubber Tire Wheel Co.*, the Court limited *Kessler* to situations where a *standalone* product was adjudicated non-infringing and that same standalone product is later sold to a customer; *Kessler* has no role where the manufacturer supplies

a component combined by others with different components to create some *new* product accused of infringement. It is undisputed here that each Defendant combines the Endeca software with other components, including software, hardware, and data, and the resulting system is used to practice the accused method (searching for files). Even assuming *Kessler* still exists at all, it does not apply where the method extends beyond the standalone product at issue in the first suit.

This Court should reverse on the basis that the district court had no grounds for expanding *Kessler* into new areas where it has never belonged. But if the Court feels bound by *Kessler*, as a result of feeling bound by *Brain Life*, SpeedTrack respectfully suggests that the panel may wish to consider a sua sponte call for initial hearing en banc.

The district court's decision was incorrect, and the judgment below should be reversed.

## STANDARD OF REVIEW

"The question of whether prior litigation results in claim preclusion in a later suit is a question of law, reviewed without deference." *Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1294 (Fed. Cir. 2001). To the extent this case turns on "general principles" of preclusion, regional law from the Ninth Circuit controls (*Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008)); "for any aspects that may have special or unique application to patent cases, Federal Circuit precedent is

applicable" (*Aspex Eyewear, Inc. v. Zenni Optical LLC*, 713 F.3d 1377, 1380 (Fed. Cir. 2013)).

This Court "reviews a district court's grant of summary judgment without deference, reapplying the same standard as the district court." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008); *see also Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1361-62 (Fed. Cir. 2013) (applying Ninth Circuit regional law). "The court must afford all reasonable inferences and construe the evidence in the light most favorable to the non-moving party." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323 (Fed. Cir. 2009); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("weighing of the evidence" and "drawing…legitimate inferences from the facts" are "jury functions"). Summary judgment is inappropriate unless, "drawing all reasonable factual inferences" in the non-movant's favor, "the evidence is such that the non-movant cannot prevail." *Optium Corp. v. Encore Corp.*, 603 F.3d 1313, 1319 (Fed. Cir. 2010).

## ARGUMENT

I. **THE DISTRICT COURT'S RES JUDICATA FINDING IS INCOMPATIBLE WITH CONTROLLING LAW IN MULTIPLE RESPECTS**

A. **Defendants Cannot Satisfy Multiple Elements Of The Controlling Standard**

In order to establish res judicata, Defendants had to show "(1) the same parties, or their privies, were involved in the prior litigation, (2) the prior litigation involved the same claim or cause of action as the later suit, and (3) the prior litigation was terminated by a final judgment on the merits." *Acumed*, 525 F.3d at 1325 (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 952 (9th Cir. 2002)). Defendants cannot satisfy two essential elements of that test: (i) the two actions do not involve "the same claim or cause of action"; and (ii) these parties and those in *Walmart* are not "identical or in privity." *Gillig v. Nike, Inc.*, 602 F.3d 1354, 1361 (Fed. Cir. 2010) (internal quotation marks omitted); *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir. 2000) (same). Each deficiency independently requires reversal.

1. **Walmart's Performance Of The Claimed Method Implicates Different Transactional Facts Than The Independent Activities Of These Separate Defendants**

Res judicata requires a claim to "arise[] from the same transactional facts as a prior action." *Acumed*, 525 F.3d at 1326. The district court found this requirement satisfied, but it was plainly mistaken. The only commonality between these

transactional facts is that wholly independent parties infringed the same method claim using at its core the same technology. This activity was entirely uncoordinated, performed at different times, engaged using different resources, and ultimately carried out by modifying the "common" technology in distinct ways. Under the district court's logic, any time any person, operating from any corner of the nation, practices a claimed method in "essentially the same" way, the patentee has a single cause of action arising from a single set of transactional facts. That theory flunks this Court's precedent, and the res judicata finding should be reversed.

A. Contrary to the court's conclusion, the *Walmart* action and this action proceed from different "set[s] of transactional facts." *Jet*, 223 F.3d at 1363. In *Walmart*, the "nucleus of operative facts" (*Gillig*, 602 F.3d at 1363) was limited to Endeca's and Walmart's implementation of Endeca's software during the period at issue. Although Walmart used software initially provided by Endeca, Walmart customized it and added other Walmart software, hardware, and data (none of which was provided by Endeca) before it was used. Since all of the asserted claims in both *Walmart* and this action are method claims, Walmart's accused acts of infringement occurred only when Walmart used Endeca's software (in its own unique way) to access files in Walmart's system.

Those key facts did *not* include any other entity's use of Endeca software. Walmart is not Office Depot; these Defendants are different parties using different

hardware, software, and data to engage in distinct activities. The controlling law asks whether the present claims "w[ere] asserted[] or could have been asserted" in past litigation. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1342 (Fed. Cir. 2012). It is perplexing to suggest that a claim against *these* Defendants (*e.g.*, Newegg's use of its own website to manage inquiries and access its own files) could have been asserted in litigation involving Walmart's use of its separate website. Each Defendants' competitive activities give rise to distinct claims, and each complaint (*Walmart* and *Office Depot*) arise from distinct transactional facts. *See, e.g.*, *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 479 (Fed. Cir. 1991).

Res judicata "embrace[s]" only "the specific devices before the court in the first suit." *Ibid.* (quoting *Young Eng'rs, Inc. v. U.S. Int'l Trade Comm'n*, 721 F.2d 1305, 1316 (Fed. Cir. 1983)). Since the claims against these Defendants were not asserted and could not have been asserted in *Walmart*, they are not barred by res judicata.

B. According to the district court, however, these suits automatically arise from the same transactional facts if each Defendant "uses the Endeca platform in 'essentially the same' way as Wal-Mart." A7-A8; *see also* A5 (res judicata asks whether "the accused product or process in the present case is 'essentially the same' as the accused product/process in the earlier case") (quoting *Nystrom v. Trex*

24

*Co.*, 580 F.3d 1281, 1285 (Fed. Cir. 2009)). Yet whether a product or method is "essentially the same" is a necessary, not *sufficient*, component of the inquiry. *Aspex*, 672 F.3d at 1342. Devices or methods that are not "essentially the same" will not implicate the same set of transactional facts. But that hardly means the converse is true—and that res judicata automatically attaches whenever any lawsuit involves the same product, despite involving independent actors and distinct activities. The right question is whether the particular activity at issue in the first suit—Walmart's particular implementation of Endeca's software—is at issue in this new suit. The court's own opinion proves it is not. A8 (recognizing each Defendant's "specific implementation of the Endeca platform").

The operative complaint does *not* allege infringement based solely on Endeca's software. It alleges that Defendants combine Endeca's software *with other components*, including Defendants' websites (*i.e.*, other software, hardware, and data not supplied by Endeca), to practice the claimed methods. *See* A234-A235, A237, A240, A242. Those "transactional facts" give rise to SpeedTrack's claims—the alleged similarities between each party's conduct does not render each independent infringing act "identical" to activity in earlier litigation.

The present claims could not have been brought in the *Walmart* litigation (key word: <u>Walmart</u>) because SpeedTrack could not blame Walmart or Endeca for acts taken by *Walmart's competitors*—Office Depot, PC Connection, Newegg, or

CDW. The "'claim' that gives rise to preclusion [encompasses] only the particular infringing acts or products that are accused in the first action or could have been made subject to that action" (*Aspex*, 672 F.3d at 1343 (citing *Young Engineers*, 721 F.2d at 1316)), and these independent acts by Walmart's competitors could not have been asserted in that earlier suit.

Defendants, in sum, effectively contend that res judicata somehow sweeps in any conduct that *resembles* conduct in a prior suit. But the fact that Walmart's use of Endeca's platform may resemble (for example) Office Depot's use of similar software does not convert the earlier suit against Walmart into a suit against Office Depot. That novel theory would eviscerate the distinction between claim and issue preclusion, and extend the sweep of res judicata to non-parties and to new activity never before involved in any litigation. There is no legal or logical basis for rewriting the doctrine in such a breathtaking fashion.

> **2. These Defendants Were Not Parties To The First Suit, And Privity Does Not Arise From A Standard Indemnification Agreement**

Contrary to the judgment below, there is no privity on these facts. A10-A12. A strong presumption exists that "'one is not bound by a judgment" unless he is "designated as a party" or "been made a party by service of process.'" *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). The Supreme Court has departed from this rule in "limited circumstanc-

es," enumerating a list of six "discrete exception[s]" for nonparty preclusion. *Id.* at 880, 893, 898. But Defendants fall outside these limited exceptions, and the district court erred in fashioning a *seventh* exception for nonparty preclusion—without once acknowledging *Taylor*'s guidance, much less following it. These Defendants were not bound by the *Walmart* litigation, and nothing in Endeca's indemnification sufficiently connects these parties to the earlier suit.[9]

A. The district court found privity because "Endeca is contractually obligated to indemnify defendants for any losses stemming from a finding of infringement." A11. This fails as a matter of law and fact.

As a matter of law, it cannot be squared with any of the six *Taylor* exceptions. In "'limited circumstances,'" nonparties may be bound if "'adequately repre-

---

[9] As their lead position below, Defendants insisted that all Endeca customers were automatically Endeca's privies by purchasing its software. A290-A291; *see also* A1848 (asserting that Defendants were "adequately represented," for privity purposes, "even *without* considering the indemnification agreements"). Defendants were wrong. Under the controlling standard, "a manufacturer or seller of a product who is sued for patent infringement typically is not in privity with a party, otherwise unrelated, who does no more than purchase and use the product." *Transclean Corp. v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298, 1306 (Fed. Cir. 2007); *see also S. Snow Mfg. Co. v. Snowizard Holdings, Inc.*, No. 13-1586, 2014 U.S. App. LEXIS 12242, at *27-28 (Fed. Cir. June 30, 2014) (unpublished) (applying *Transclean* in the context of a distributorship; "the person who buys an allegedly infringing product is not considered to be in privity with the person who sells him the product"). Especially against *Taylor*'s demanding standard, a manufacturer-customer relationship falls far short of the "substantive legal relationship" necessary to bind nonparties to earlier litigation. *See* 553 U.S. at 894.

sented'" by a party "'with the same interests.'" 553 U.S. at 894 (quoting *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)). But this is not "adequate representation" in a colloquial sense. The exception is limited to particular suits with formal procedures ("properly conducted class actions") or specific, traditional legal relationships ("suits brought by trustees, guardians, and other fiduciaries"). *Id.* at 894. Indemnification might obligate a manufacturer to front the cost of legal fees and cover damages—or even handle litigation—but that hardly transforms every suit involving a *manufacturer* (much less its other customers) into a suit involving the entire customer base. Consumers gain protection via indemnification; they do not instantly forfeit their procedural rights. *Id.* at 901. Had the shoe been on the other foot and had Endeca lost in *Walmart*, Defendants assuredly would resist the suggestion that they had their day in court and were bound by the outcome.

As a factual matter, Defendants cannot establish that they were "adequately represented" in *Walmart*. In proceedings below, Defendants rested entirely on their license agreements with Endeca, but redacted everything except Section 9's indemnification provision. *See* A1064-A1079. Yet Section 9 only establishes that Endeca would pay for Defendants' litigation costs and losses when *Defendants themselves* were sued for infringement; it nowhere conveyed any indication that Defendants were automatically bound in any suit involving Endeca's software, including suits involving exclusively other parties. Section 9 did not even obligate

Defendants to use the indemnification; any Defendant could refuse Section 9's conditions and elect to represent themselves without Endeca. And even when indemnification is activated, the agreement still guaranteed the "Indemnified Party" the right to "participate in the defense of any claim through its own counsel, and at its own expense." A1940. That right presupposes the opportunity to litigate in one's own case, not to be immediately bound whenever Endeca participates in litigation with other parties. Even read alone, Section 9 falls short of privity by "adequate representation."

But Section 9 cannot be read alone. In a key section redacted by Defendants twice in filings below—once when submitting the agreements with their motion to dismiss and again on summary judgment—the license unambiguously *disclaims* any representative role ("adequate" or otherwise) between Endeca and each Defendant:

> 12.10. No Agency; Independent Contractors. *Nothing contained in this Agreement shall be deemed to imply or constitute that either Party is the agent or representative of the other Party*, or that both parties are joint ventures or partners for any purpose.

A1942 (emphasis added). Thus, these agreements—in passages conspicuously removed and uncited by Defendants—establish on their face that the indemnification provision does *not* transform Endeca into an "adequate representative" for any reason. By their own agreement, neither Endeca nor Defendants would have understood during *Walmart* that Endeca was litigating on behalf of everyone—to be

bound, win or lose, by that judgment. Even if Defendants had other proof suggest-ing "adequate representation" (and they did not), they cannot overcome the effect of this clause for purposes of summary judgment. There is, at a minimum, a fact issue. *Anderson*, 477 U.S. at 255. And this is to say nothing of other facts (also unmentioned below by Defendants) that further refute privity under *Taylor* (*see* 553 U.S. at 894, 900-01), including that not one of Defendants' witnesses would testify that Endeca acted as their trustee, guardian, or fiduciary (A1971-A1988).[10]

According to its plain terms, this indemnification agreement thus disclaims "*any*" representative capacity and preserves the rights of each Defendant to partici-pate separately in the litigation. *See, e.g.*, A1940, A1942. This is strictly incon-sistent with the court's finding (especially on *summary judgment*) that Endeca's role in *Walmart* satisfied *Taylor*'s high threshold for "adequately representing" these nonparty Defendants. 553 U.S. at 900-01.[11]

---

[10] The district court explicitly stated that "section 12.10 should not have been re-dacted from defendants' filings" and admonished that "defendants have unneces-sarily complicated the issue by attempting to hide section 12.10 of the indemnifica-tion agreements." A11.

[11] Contrary to the district court's contention (A11-A12), SpeedTrack nowhere con-ceded that Defendants were in privity or represented by the *Walmart* defendants. In a case-management statement, SpeedTrack noted that the *consequence* of estab-lishing privity would include precluding relitigation of certain issues resolved in *Walmart*. A181-182. But SpeedTrack explicitly reserved a position on privity itself because it lacked the information necessary to assess the issue. It was Defendants

[Footnote continued on next page]

B. In addressing the "agency" disclaimer—no representation "for any pur-

pose"—the district court reasoned that the clause established an "outer limit" on

the parties' relationship, but did not impair any finding of representation *for pur-*

*pose of these suits*. For that purpose, the district court asserted, the indemnification

itself was controlling. A10-A11. Yet the disclaimer's categorical language presum-

ably means what it says. And when one party attests not to represent another for

"*any* purpose," that necessarily includes any litigation. The court's explanation

cannot account for the plain text of the agreement, and that is reason alone to reject

its decision.[12]

_____

[Footnote continued from previous page]

that declared indemnification irrelevant to the suit (A806-A809)—until flatly
switching positions in their Rule 12(b)(6) reply to argue privity. SpeedTrack, how-
ever, has always conceded that privity must apply equally to both sides—precisely
because none of the parties "can[] have it both ways" (A11).

[12] Rather than grapple with *Taylor*'s authoritative guidance, the court below in-
stead adopted the scant reasoning (one paragraph) of an unpublished disposition of
a district court from another circuit. *See* A10-A11 (discussing *Global Maintech
Corp. v. AIG Techs., Inc.*, No. 04-4638, 2006 U.S. Dist. LEXIS 11486 (D. Minn.
Feb. 15, 2006)). That decision is nonprecedential and unpersuasive. It arose before
*Taylor* and thus failed to apply the Supreme Court's controlling analysis. It further
relied on the lower court's very reasoning in *Transclean* that *this Court later re-
jected*. *Compare* 2006 U.S. Dist. LEXIS 11486, at *9 (citing the district court in
*Transclean* as finding privity from a user-manufacturer relationship), *with
Transclean*, 474 F.3d at 1306 (rejecting exactly that proposition). This decision
cannot overcome *Taylor*'s heavy presumption against nonparty preclusion.

C. Finally, the district court's disposition implicates serious due-process concerns and invites gamesmanship. The court's rationale veers dangerously close to the kind of "virtual representation" that *Taylor* itself specifically rejected. If it is sufficient to identify an "identity of interests and some kind of relationship between parties and nonparties," then important "procedural protections," "grounded in due process, could be circumvented." 553 U.S. at 901. Privity cuts both ways; if it applies here to bind SpeedTrack, it could apply in future cases to bind nonparty customers—all on the strength of an agreement that disclaims any representative capacity. Any time a manufacturer litigates an action involving its products, countless customers with indemnities would risk being automatically bound by the result with no right to litigate on their own. True "adequate representation" cases have traditional safeguards to protect each party's right to its day in court. *Id.* at 892-93. The district court identified no such safeguards here.

Nor is it any answer that these Defendants had notice of the prior action. While notice may reduce due-process concerns, it increases the risk of gamesmanship. An indemnification agreement should not be used to establish privity only after the first suit is concluded and the outcome is certain. That permits an improper tactical advantage and unduly prejudices opposing parties. If Defendants wished to invoke these agreements, they should have acted while the result in *Walmart* was

32

an open question. To disclaim reliance on the agreements until *Walmart* was re-
solved is improper and should be rejected.

Privity is an indispensable element of Defendants' res judicata defense, and
they have failed to carry their burden on that prong. Their res judicata defense ac-
cordingly fails, and the district court's contrary judgment should be reversed.

### B.  Even If Res Judicata Somehow Applies, It Is Limited To The Precise Claims Adjudicated In *Walmart*, And The District Court's Contrary Holding Squarely Conflicts With Circuit Precedent

The district court erred in applying res judicata at all, and it erred again in
extending res judicata to preclude all claims arising before the date of *Walmart*'s
final judgment. Under settled law, res judicata covers only those claims that were
actually adjudicated in the *Walmart* action. Because the last of those claims arose
on the date of SpeedTrack's counterclaims against Endeca (May 25, 2007), the dis-
trict court erred in applying res judicata to the full time period between the filing of
those counterclaims and *Walmart*'s final judgment (March 30, 2012). Even if this
Court affirms on res judicata, it should reverse this portion of the court's ruling and
restore the proper scope of the claims at issue on remand.

1. According to the district court, res judicata (i) does not bar "claims related
to acts of infringement that *post-date* the judgment in the earlier case," but (ii) does
bar all claims that "'*predate*'" the judgment, even if those claims were never for-
mally added to the suit. A6-A7 (quoting *Brain Life*, 746 F.3d at 1053; first empha-

sis added). The court thus declared SpeedTrack's claims barred through March 30, 2012 (the date of *Walmart*'s judgment) rather than through May 25, 2007 (the date of SpeedTrack's counterclaims).

This ruling was incorrect. Under binding Federal Circuit precedent, res judicata turns on the date the complaint was filed, not the date of the judgment. "In patent cases, this court has applied the general rule that res judicata does not bar the assertion of 'new rights acquired during the action which might have been, but were not, litigated.'" *Aspex*, 672 F.3d at 1345 (quoting *Gillig*, 602 F.3d at 1363). "While a party may seek to pursue claims that accrue during the pendency of a lawsuit adjudicated in that lawsuit, the party is not required to do so, and res judicata will not be applied to such accruing claims if the party elects not to have them included in the action." *Ibid.* A party, in short, "may seek leave to file a supplemental pleading to assert those claims, but 'the doctrine of res judicata does not punish a plaintiff for exercising the option not to supplement the pleadings with an after-acquired claim.'" *Gillig*, 602 F.3d at 1363.

These unambiguous statements directly refute the court's ruling below, and the court's claim that SpeedTrack somehow has "no support" for its position (A7) is mistaken. At most, res judicata extends no further than SpeedTrack's counterclaims.

2. The district court maintained that the filing date of a party's claims was "[in]significan[t]" (A7), but this overlooks core principles. The law in *Aspex* and *Gillig* is not arbitrary. For preclusion purposes, an infringement claim "embraces" only "the specific devices before the court in the first suit" (*Young Eng'rs, Inc. v. U.S. Int'l Trade Comm'n*, 721 F.2d 1305, 1316 (Fed. Cir. 1983)), and "'[t]he scope of litigation is framed by the complaint at the time it is filed'" (*Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997) (quoting *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 750 F.2d 731, 739 (9th Cir. 1984) (en banc)).

The governing principle is thus clear: the only claims necessarily at issue in *Walmart* were those *put* at issue in *Walmart*. If SpeedTrack had filed a supplemental pleading targeting post-complaint conduct, those claims would now be subject to preclusion. But SpeedTrack's pleading targeted only activity arising *before* its counterclaim, not after it. That date marked the very end of the time period adjudicated in *Walmart*. Because *Walmart* could not have decided any claims after that date, *Walmart* cannot foreclose any claims after that date. *Aspex*, 672 F.3d at 1343-45; *see also, e.g., Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (a prior judgment "cannot be given the effect of extinguishing claims which

did not even then exist and which could not possibly have been sued upon in the previous case").[13]

    3. Nor is the district court correct that res judicata captures any claims that "could have [been] asserted" in the earlier suit. A7 (determining that SpeedTrack's claims were barred through final judgment "[e]ven though SpeedTrack may have chosen not to assert claims of ongoing infringement"). It is true that "the 'claim' that gives rise to preclusion" is often described as "the particular infringing acts or products that are accused in the first action or *could have been made subject* to that action." *Aspex*, 672 F.3d at 1343 (citing *Young Eng'rs*, 721 F.2d at 1316; emphasis added). But this Court has already confirmed that, "for res judicata purposes, claims that 'could have been brought' are claims in existence at the time the original complaint is filed or claims *actually* asserted by supplemental pleadings or otherwise in the earlier action." *Id.* at 1345 (quoting *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992); emphasis in original). The operative phrase—"could have been raised"—refers instead to "*legal theories* arising out of the same transactional nucleus of facts, rather than to distinct causes of action." *Acumed*,

---

[13] Any concern about repetitive litigation is resolved by collateral estoppel: if a later claim is "essentially the same" as an earlier claim (A5), any issues actually litigated and squarely resolved in the first suit will typically be foreclosed in the second suit. With that backstop, there is no reason to extend res judicata beyond its proper scope.

525 F.3d at 1326 (quoting *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 686 n.2 (9th Cir. 2005); emphasis added); *see also id.* at 1325-26 ("None of these cases, however, support Stryker's contention that a claim is barred by claim preclusion merely because it *could have been raised* in a prior action between the parties that was resolved on the merits.").

The fact that a claim "could have been" added is ultimately irrelevant unless it was *in fact* added to the suit. The district court was wrong to discard circuit precedent in ruling otherwise.[14]

4. Nor is the district court correct that the Ninth Circuit (as the regional circuit) would reach the opposite conclusion. The court invoked *Guild Wineries & Distilleries v. Whitehall Co.*, 853 F.2d 755 (9th Cir. 1988), for the proposition that "[t]he date of judgment…controls the application of res judicata principles." A7

---

[14] Defendants may assert that *Nystrom v. Trex Co.*, 580 F.3d 1281 (Fed. Cir. 2009), held that res judicata bars a second lawsuit even though the products at issue in the second action came into existence after the conclusion of the first action (*see* 580 F.3d at 1284). In *Nystrom*, however, the court neither raised nor resolved whether res judicata applies when the products at issue did not exist during the first action. It instead answered the narrow question posed by the parties: whether a minor alteration, leaving the second product "essentially the same" as the first, could undermine res judicata *if res judicata otherwise applied. Id.* at 1285-86. It is well settled that a court *holds* nothing on legal points it does not address. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). And any attempt to read *Nystrom* as deciding a principle it never addressed would set up *Nystrom* in direct conflict with controlling law; *Nystrom* should remain confined to its intended scope.

(quoting 853 F.2d at 761). But *Guild* addressed a different issue entirely: the *timing* of when a res judicata defense ripens. *See* 853 F.2d at 761. *Guild* merely confirmed that res judicata is activated once final judgment is entered, even if the precluded suit was filed first. *Ibid.* ("Nor is it relevant that the administrative complaint in this case was filed after the federal diversity action. *The date of judgment, not the date of filing, controls the application of res judicata principles.*") (emphasis added). This means that res judicata does not turn on any race to the courthouse: "When the same claim or issue is litigated in two courts, the second court to reach judgment should give res judicata effect to the judgment of the first, regardless of the order in which the two actions were filed." *Americana Fabrics v. L & L Textiles, Inc.*, 754 F.2d 1524, 1529 (9th Cir. 1985) (cited in *Guild*). That issue of timing, undisputed here, has nothing to do with which claims (post-complaint versus pre-judgment) are covered by the defense.

As for that *relevant* question, the Ninth Circuit follows the same rule recognized in this Circuit: "The rule that a judgment is conclusive as to every matter that might have been litigated 'does not apply to new rights acquired pending the action which might have been, but which were not, required to be litigated.' Plaintiffs may bring events occurring after the filing of the complaint into the scope of the litigation…, but there is no requirement that plaintiffs do so." *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 750 F.2d 731, 739-40 (9th Cir. 1984) (en banc) (citations

omitted); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 382 n.12 (9th Cir. 1998) (same); *see also Gillig*, 602 F.3d at 1363 (favorably citing *L.A. Branch NAACP* as support for the Federal Circuit rule).

5. Finally, the district court was incorrect that *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045 (Fed. Cir. 2014), adopted the opposite position from *Aspex*, automatically barring claims through the date of judgment. *Brain Life* did not silently create an intra-circuit conflict on an issue that it neither addressed nor resolved. On the contrary, it cited for support the very cases that articulate this Court's position on the issue (*e.g.*, *Aspex*, *Young Eng'g*), and it likewise invoked cases from other circuits (*e.g.*, *Manning*) that stand for the same proposition. *See Brain Life*, 746 F.3d at 1053-54. Unlike *Aspex* and *Gillig*, *Brain Life* did not explicitly decide whether the filing date of the complaint was the operative date for preclusion purposes. Had the panel wished to discard settled law on this point, it surely would have said something directly on the question. Its silence is telling. *See, e.g.*, *Cooper Indus.*, 543 U.S. at 170 ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

Because the *Walmart* litigation did not involve any claims arising after the filing of SpeedTrack's counterclaims, the district court erred in applying res judi-

cata to claims arising after the counterclaim was filed and before final judgment was entered. Even if any portion of the court's res judicata ruling stands, its decision on this score should be reversed.[15]

## II. THE COURT'S *KESSLER* RULING CREATES A CIRCUIT CONFLICT, UNDERMINES PRECLUSION DOCTRINE, MISREADS *KESSLER*, AND IMPERMISSIBLY DEPARTS FROM GENERAL LEGAL PRINCIPLES FOR PATENT CASES ALONE

The district court precluded the entirety of SpeedTrack's suit under *Kessler v. Eldred*, 206 U.S. 285 (1907), an obsolete doctrine that this Court itself has called into doubt. *See Brain Life*, 746 F.3d at 1058 (applying *Kessler* even though its "continuing force…may be questionable"). The district court was mistaken.

While not expressly overruled, the *Kessler* doctrine has been effectively displaced by modern preclusion principles. Once the Supreme Court revised its preclusion jurisprudence to abandon the mutuality requirement, *Kessler* was abandoned with it. Today's rules of claim and issue preclusion occupy the field; they inform exactly which actions are foreclosed and which are protected. The court's

---

[15] Res judicata only covers the actual products (or actual conduct) at issue in the first suit. Thus, for example, if SpeedTrack sued Walmart for infringement based on its use of v.10 of Endeca's software, SpeedTrack can lose and *still* sue Walmart for infringement based on its use of the same v.10 of Endeca's software *for any use after the first suit is over*. The suit would not get very far due to collateral estoppel (assuming the identical issues were presented), but the second suit would not be barred by res judicata. *See, e.g.*, *Brain Life*, 746 F.3d at 1054.

decision to rely on *Kessler* discounts the Supreme Court's recent jurisprudence. It precludes a suit that is protected under ordinary law. Its holding squarely conflicts with the preclusion rules applied in all other circuits and in the Supreme Court. And it adopts a preclusion framework unique for patent disputes despite the Supreme Court's express instruction against patent-specific departures from general legal principles. For these reasons alone, to the extent this case is controlled by *Brain Life*, initial hearing en banc is warranted, and the judgment below should be reversed.

Worse still, the district court could have sidestepped these problems entirely. Even without revisiting *Kessler* or reconsidering *Brain Life*, this case is distinguishable from *Kessler* on multiple fronts. Both *Kessler* and *Brain Life* involved the judgment-winner, a manufacturer, seeking the benefits of its own judgment. This case, by contrast, involves *customers* who never participated in the earlier litigation. Whether a customer (as opposed to a manufacturer) is entitled to invoke *Kessler* is a question *Kessler* itself explicitly reserved, and one that divided the circuits back when *Kessler* remained viable. Even if there is some duty to retain *Kessler*, there is no duty to aggravate existing conflicts by *expanding Kessler* beyond its original scope.

Unlike *Kessler* again, this case concerns *method* claims, not *product* claims. Each Defendant uses Endeca's "protected" software as a mere component of its

system, while performing the actual method together with its own separate hardware, software, and data. Not only is this distinguishable from *Kessler*, but it places the case comfortably within the rule of *Rubber Tire*. Under that doctrine, whatever protection *Kessler* affords, the protection disappears once an end-user combines "protected" material with other material to practice a separate process. *Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co.*, 232 U.S. 413 (1914). The district court's holding is irreconcilable with this rule.

In *Brain Life*, this Court invoked *Kessler* for only the second time in 30 years of its published decisions. To the extent *Brain Life* controls, SpeedTrack respectfully suggests that *Brain Life* warrants rehearing. It departed from traditional preclusion rules to create unnecessary splits with the law of every other circuit (and the Supreme Court) in every non-patent context. The panel in this case may wish to consider the matter sua sponte for initial hearing en banc. Otherwise, there is no reason to expand the doctrine beyond its original footprint—and only a clear expansion conceivably supports the judgment below. Whatever the ultimate fate of *Kessler* and *Brain Life*, the judgment should be reversed.

A.   **The Supreme Court Displaced *Kessler* When It Decided *Blonder-Tongue*, And This Court Then Revived *Kessler* Despite Its Conflicts With Prevailing Law**

1. The *Kessler* doctrine is a variant of collateral estoppel developed during "the heyday of the federal mutuality of estoppel rule." *Brain Life*, 746 F.3d at 1057

42

(quoting *MGA, Inc. v. Gen. Motors Corp.*, 827 F.2d 729, 733 (Fed. Cir. 1987)). *Kessler* arose at a time when any preclusion—res judicata or collateral estoppel—was limited to parties or privies in earlier litigation. *See MGA*, 827 F.2d at 733. This meant that nonparties had no power to invoke earlier judgments to prevent duplicative litigation, even when identical issues had been litigated and resolved in an earlier case. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 321-22 (1971) (describing "the judge-made doctrine of mutuality").

    *Kessler* sought to lessen that burden. The Supreme Court carved a narrow exception to the "mutuality" rule that in effect mirrors today's version of "non-mutual" collateral estoppel: a manufacturer, having obtained an earlier judgment, was permitted to enjoin the losing plaintiff from filing future suits against the manufacturer's customers that undermined the litigated verdict. *Kessler*, 206 U.S. at 289. That, in effect, permitted collateral estoppel even where "mutuality" did not exist: without *Kessler*'s exception, a customer had no means to avoid relitigating identical questions determined in the manufacturer's suit. By granting relief to the manufacturer, *Kessler* put an end to identical, duplicative suits designed to harass customers or directly undermine the manufacturer's earlier win. *Ibid.* ("[l]eaving entirely out of view any rights which Kessler's customers have or may have," the manufacturer was entitled to enforce his "right[]…once established by the final judgment").

The Supreme Court, however, abandoned the old "mutuality" rule in *Blonder-Tongue*. *See* 402 U.S. at 349 (authorizing defensive collateral estoppel and rejecting the "uncritical acceptance of the principle of mutuality of estoppel"). With that rule's demise, *Kessler* became unnecessary. Under *Blonder-Tongue*, collateral estoppel now achieves the limited advantage *Kessler* offered manufacturers in the early 1900s: under today's doctrine, nonparty-customers can identify identical issues, actually litigated, in earlier suits where those issues were essential to the judgment and preclusion is fair. *See Allen v. McCurry*, 449 U.S. 90, 94-95 (1980); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326-27 (1979). Where, for example, a manufacturer establishes that a patent is not literally infringed, an identically situated customer may invoke collateral estoppel (just as any party may invoke estoppel in other settings) to avoid wasteful relitigation of matters that were fully aired in an earlier suit. Where, however, an earlier suit fails to involve *actual* litigation over the same issues, nothing in today's doctrine (or *Kessler*) suggests that subsequent customers may demand a virtual license to infringe without having to defend their conduct: collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first," and "the parties are free to litigate points which were not at issue in the first proceeding." *Comm'r v. Sunnen*, 333 U.S. 591, 598, 599-600 (1948); s*ee also Taylor*, 553 U.S. at 892 (recognizing estoppel's requirements); *MGA*, 827 F.2d at 734

("the *Kessler* doctrine…in its effect may be compared to defensive collateral estoppel").

*Kessler* was cut from the same cloth as collateral estoppel, and addressed a past shortcoming that modern preclusion doctrine has separately resolved. *Allen*, 449 U.S. at 94 ("In recent years, this Court has reaffirmed the benefits of collateral estoppel in particular, finding the policies underlying it to apply in contexts not formerly recognized at common law."). The Supreme Court's latest jurisprudence now occupies the field; a broad application of *Kessler* is inconsistent with that jurisprudence. It threatens to preclude actions that are rightfully permitted, and it invites a direct conflict with the careful limits placed on preclusion today. *See, e.g.*, *Blonder-Tongue*, 402 U.S. at 329 (describing the limits on collateral estoppel as "a most significant safeguard"); *Allen*, 449 U.S. at 95 (emphasizing "limitation[s]" on estoppel).

2. In *Brain Life*, however, this Court revived the *Kessler* doctrine. The panel held that a lawsuit—raising new claims and issues that had never before been litigated—was still precluded under *Kessler* despite surviving under modern principles. *See* 746 F.3d at 1059. According to *Brain Life*, *Kessler* grants a "'limited trade right'" over "specific products" held not to infringe, "even when the specific *acts* of infringement would not be barred by claim preclusion." 746 F.3d at 1057 (quoting *MGA*, 827 F.2d at 734). So long as the devices in each suit are "essential-

45

ly the same," the new products automatically "acquire[] the status of a noninfring-

ing device." *Ibid.* The fact that certain issues had never been litigated was declared

irrelevant. *Id.* at 1058-59. Thus, even though the patentee's claims were protected

under "claim or issue preclusion," they were held barred by *Kessler. Id.* at 1059.

The *Brain Life* panel recognized that *Kessler* was possibly a mere "excep-

tion" to the old "mutuality requirement," and its "continuing force" may be "ques-

tionable" in the face of modern "developments." 746 F.3d at 1057-58. Yet finding

that the doctrine "exists," the panel felt "bound" to apply it, "even if its viability

under current estoppel law may be of less value now than it was at the time it was

handed down": "Whether the *Kessler* Doctrine is an exception to the mutuality of

estoppel rule or a matter of substantive patent law is a question we cannot answer.

We may only apply the law as it continues to exist." *Id.* at 1058.

*Brain Life* marked the first time in nearly *three decades* that this Court ad-

dressed *Kessler* in a published opinion (*MGA* was the last). The panel was left to

resolve this important, complex issue without the benefit of full briefing: The ac-

cused infringer merely cited *Kessler* "under the general rubric of claim preclu-

sion," not as some independent doctrine (*Brain Life*, 746 F.3d at 1056 (describing

the party's theory)), and the patentee failed to cite or discuss the case at any point

in its briefing (opening or reply). *See* No. 13-1239, Dkts. 21, 24, 27. As it stands

today, however, the rule in *Brain Life* precludes legitimate claims that would survive in every other circuit under the traditional rules of claim and issue preclusion.

**B.    There Are Compelling Reasons For *Kessler* And *Brain Life*
        To Be Reconsidered By The En Banc Court**

The panel's decision in *Brain Life* splits with other circuits, departs from general legal principles, conflicts with this Court's own *Aspex* decision, and even misreads *Kessler* itself. While the Supreme Court could address this issue further and resolve these conflicts, a sua sponte initial hearing en banc is more appropriate. *See* Fed. Cir. R. 35 practice notes ("The court may sua sponte order that an appeal be initially heard or reheard en banc.").

1. By resuscitating *Kessler*, *Brain Life* falls out of step with the Supreme Court and every other circuit on ordinary preclusion principles. Inconsistent with the limits on res judicata, *Brain Life* incorrectly bars claims accruing after the first suit is done. Inconsistent with the limits on collateral estoppel, *Brain Life* incorrectly forecloses litigation over new issues never litigated in any dispute. This is not merely "fill[ing] the gap" (*Brain Life*, 746 F.3d at 1056). Preclusion principles draw a fine line between precluded and permitted suits; it is just as important to identify what *may* proceed as what *may not* proceed. *See, e.g., Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971) ("the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard"); *Sunnen*, 333 U.S. at

47

599-600 (imposing limitations on estoppel to "avoid injustice"). By expanding *Kessler* and departing from generally applicable preclusion principles, *Brain Life* creates a stark conflict between preclusion rules in this circuit and all other circuits.

    *Brain Life* also imposes substantial intra-circuit conflict by extending *Kessler*'s preclusion to post-suit activities. Whereas cases such as *Aspex* confirm the traditional rule that post-suit torts are not precluded by an earlier judgment, *Brain Life* applies *Kessler* to instantly foreclose the exact claims that *Aspex* specifically allows. *See also Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 2014 U.S. App. LEXIS 5877, at *26-27 n.1 (Fed. Cir. 2014) (O'Malley, J., dissenting) (explaining how *Kessler*, under *Brain Life*, might bar "post-judgment" claims, "despite our holding in *Aspex*").

    There is no reason to presume that Congress or the Supreme Court intended such a dramatic rewriting of the rules of preclusion uniquely for patent disputes. Res judicata and collateral estoppel serve effectively to limit unnecessary litigation across all subjects. There is little benefit to splitting with those settled rules (applied in all other courts) in this substantive area alone.[16]

---

[16] *Brain Life* also debatably splits with *MGA, Inc. v. Gen. Motors Corp.*, 827 F.2d 729 (Fed. Cir. 1987), which conspicuously characterized *Kessler* as "effect[ively]" a form of "defensive collateral estoppel." 827 F.2d at 734. *Brain Life*'s view—which sweeps far past core limits of collateral estoppel—is incompatible with *MGA*'s earlier understanding of the same doctrine.

2. *Brain Life*'s understanding of *Kessler*, applied to patent disputes alone, is directly at odds with the Supreme Court's instructions to avoid patent-specific departures from generally applicable legal principles. *See, e.g.*, *eBay v. MercExchange, LLC*, 547 U.S. 388, 391-92, 394 (2006); *Dickinson v. Zurko*, 527 U.S. 150, 165 (1999).

Issue and claim preclusion fit comfortably within the category of "generally applicable" legal rules. By invoking *Kessler*—again, for only the second time in over three decades of this Court's published opinions—the law of the circuit now squarely conflicts with the law of every other circuit (and the Supreme Court) on res judicata and claim preclusion. Whereas a suit arising in any non-patent dispute on these facts would proceed, *Brain Life*'s invocation of *Kessler* erects a bar that exceeds traditional limits on *both* res judicata and collateral estoppel. This is exactly the kind of doctrinal split, on generic legal principles, that cases such as *eBay* and *Zurko* have cautioned against.

Nor is there any basis for thinking that *Kessler* "espouse[d] a specific doctrine of substantive patent law." *Brain Life*, 746 F.3d at 1057. There is not a single indication anywhere in *Kessler* that the Court's analysis was predicated on the patent subject-matter of that case, rather than the fortuity that the case happened to involve patents. The Court's opinion did not cite a single provision of the Patent Act; it did not reference any specific patent doctrine, or suggest any basis for cab-

ining its rule to patent disputes. This was nothing more than a plain attempt to craft an exception to the strict rules of mutuality in existence *at that time*. *Kessler* sought to avoid the same unfairness that ultimately convinced the Supreme Court in *Blonder-Tongue* to allow defensive non-mutual collateral estoppel. *Kessler*, however, did not seek to rewrite preclusion rules exclusively for patent cases.

That *Kessler* was not specific to patent law is reinforced by later preclusion cases in the Supreme Court. *Blonder-Tongue* itself was a *patent* case, yet the Supreme Court never cast its holding as limited to patent disputes. On the contrary, the Court has repeatedly cited *Blonder-Tongue* as setting new rules of preclusion, generally, cutting across all substantive areas. *See, e.g.*, *Taylor*, 553 U.S. at 899, 907; *Allen*, 449 U.S. at 94-95; *Parklane Hosiery*, 439 U.S. at 326-27. There is no reason to presume that *Kessler* (without saying so) announced a "specific doctrine of substantive patent law," while *Blonder-Tongue* (also involving patents) articulated general principles in the law of preclusion.

3. *Brain Life* also misread *Kessler* (contrary to the decisions of multiple circuits) to override the limits on collateral estoppel and bar litigation over issues that had never previously been addressed. According to *Brain Life*, once products acquired the status "as non-infringing devices," *Kessler*'s "limited trade right" immunized the manufacturer from any further litigation over the product. The patent-

ee was "barred from asserting that they infringe the same patent claims a second time," even on the basis of entirely new legal issues. 746 F.3d at 1045.

*Kessler*, however, had no occasion to address that question. The issue in *Kessler* was framed as the patentee asserting the identical infringement allegations in each case. The Court never said that the second suit would be barred had the patentee raised an entirely new issue. The manufacturer's judgment was fully honored by preventing the relitigation of matters the first suit actually resolved; there was no reason to think the manufacturer was entitled to greater protection than other litigants raising a proper preclusion defense. The Court surely would have addressed the question explicitly had it intended to abrogate a bedrock limit on collateral estoppel: "As this Court has long recognized, 'a major departure from the long tradition of equity practice should not be lightly implied.'" *eBay*, 547 U.S. at 391.

In reaching the opposite conclusion, *Brain Life* is at odds with decisions in other circuits. When *Kessler* was viable, multiple circuits rejected *Brain Life*'s expansive view of *Kessler*. In *Selden Co. v. Gen. Chem. Co.*, 73 F.2d 195 (3d Cir. 1934), for example, the court recognized that *Kessler* was limited to issues actually resolved in the first action. 73 F.2d at 197 (reasoning that *Kessler* "does not apply" since "the issues involved in the Maryland suit were not the same as those covered in the Pennsylvania suit"). And in *Gen. Chem. Co. v. Standard Wholesale Phos-*

*phate & Acid Works, Inc.*, 101 F.2d 178 (4th Cir. 1939), the court reached the identical conclusion, thus limiting *Kessler* to its proper scope—in effect an early version of modern defensive collateral estoppel. *See MGA*, 827 F.2d at .734.

This alternative reading of *Kessler* is correct. It preserves the fundamental limits on collateral estoppel and avoids a conflict on this issue with other circuits.

Given these serious issues and significant conflicts, *Brain Life* should be reconsidered.

### C. Even If *Kessler* And *Brain Life* Survive, This Case Is Readily Distinguishable—And There Are Compelling Reasons Not To Extend *Kessler* Beyond Its Initial Scope

1. Even if "the *Kessler* Doctrine" somehow survives and this Court is "bound" to enforce it (*Brain Life*, 746 F.3d at 1058), there is no reason to expand the doctrine beyond its original footprint. Any effort to extend *Kessler* (out of deference to the Supreme Court) runs immediately into *other* conflicts with the Supreme Court. As explained above, under *Brain Life*, the *Kessler* doctrine bars actions that are permitted under the Court's settled preclusion doctrine (issue and claim) in every non-patent context. It departs from generally applicable legal principles—contrary to the Supreme Court's guidance—and it produces doctrinal tension at an inter- and intra-circuit level. All these costs can be minimized by restricting *Kessler* to its original application.

2. Under a faithful application, *Kessler* fails to reach this case for two independent reasons.

First, unlike *Kessler*, this case involves defendant customers who did not litigate the initial suit or obtain any judgment in that suit. The district court set aside this factor on the logic that *Kessler* and *Brain Life* focus on the *product*, not the party. A15. But *Kessler* itself explicitly reserved this question (*Kessler*, 206 U.S. at 289), and *Brain Life* had no occasion to resolve it (since *Brain Life* involved the original manufacturer). The question has divided circuits in the past, and it remains an open question in this Court. *See, e.g.*, *Tech. Licensing Corp. v. Thomson, Inc.*, 738 F. Supp. 2d 1096, 1101-02 (E.D. Cal. 2010) ("The Supreme Court, Federal Circuit, and Ninth Circuit[]…have declined to address the issue of whether the customer has the right to invoke the *Kessler* doctrine as a defense to patent infringement suits."); *compare Wenborne-Karpen Dryer Co. v. Dort Motor Car Co.*, 14 F.2d 378, 379 (6th Cir. 1926) (refusing to allow customers to invoke *Kessler*), *with Gen. Chem. Co.*, 101 F.2d at 180-81 (permitting customers to invoke *Kessler*, and openly disagreeing with *Wenborne-Karpen*).

In light of modern doctrine—and in the interest of minimizing conflict with that doctrine—this Court should reverse the district court's willingness to join this split on the side that maximizes *Kessler*'s scope.

Second, *Kessler* is readily distinguishable (even under *Brain Life*'s interpretation) under the Supreme Court's *Rubber Tire* decision. *Kessler* is limited to situations where the manufacturer is selling a product separately on its own; *Kessler* does not apply where the manufacturer is selling a *component* that is later combined with other objects (such as each Defendants' additional software) and that *combined* product infringes. *See Rubber Tire*, 232 U.S. at 419 ("it continues only so long as the commodity to which the right applies retains its separate identity"; "[t]he decree gave it no privilege to demand that others should be allowed to make and sell the patented structure in order that it might have a market for its rubber"); *see also Woodward Co. v. Hurd*, 232 U.S. 428, 429-30 (1914) (same); *Seim v. Hurd*, 232 U.S. 420, 426-27 (1914) ("There was no actual infringement until they made the tire and for their act in making it they could not escape liability by the purchase of parts from others."). This is even true when the consumer is ultimately left with *exactly* the same product that the manufacturer established did not infringe in an earlier lawsuit.

This rule dooms the district court's decision. It is not true that the software alone, as a product, infringes the claimed method. *See, e.g.*, *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993) (method claims are "directly infringed only when the process is performed"). That software does nothing until each Defendant implements Endeca's platform—adding its own code, using its own hard-

ware, and inserting its own files. *See, e.g.*, *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 446 (2007) ("Neither Windows software (*e.g.*, in a box on the shelf) nor a computer standing alone (*i.e.*, without Windows installed) infringes AT&T's patent."). Indeed, merely implementing Endeca's software on Defendants' platforms alone is not enough to practice the claimed inventions. To infringe the asserted claims of the '360 patent, Defendants must actually use their platform, software, and data together with Endeca's software to create the required "category description tables," "file information directory," and "search filter."

This disqualifies Defendants' activities from relief under *Kessler*. This Court should recognize that the Supreme Court has jettisoned *Kessler* from its jurisprudence. But if any remnant of *Kessler* is left, it cannot overcome the separate restrictions in *Rubber Tire*.

## CONCLUSION

The judgment should be reversed, and the case should be remanded for further proceedings.

Respectfully submitted.

/s/ *Daniel L. Geyser*

Roderick G. Dorman        Daniel L. Geyser
   *Principal Attorney*       MCKOOL SMITH, P.C.
Alan P. Block                300 Crescent Court, Suite 1500
MCKOOL SMITH HENNIGAN, P.C.    Dallas, TX 75201
865 South Figueroa St., Suite 2900    Tel.: (214) 978-4014
Los Angeles, CA 90017        Fax: (214) 978-4044
Tel.: (213) 694-1200         *dgeyser@mckoolsmith.com*
Fax: (213) 694-1234
*rdorman@mckoolsmithhennigan.com*
*ablock@mckoolsmithhennigan.com*

*Counsel for Plaintiff-Appellant
SpeedTrack, Inc.*

August 11, 2014

# ADDENDUM

## INDEX TO ADDENDUM

Order Granting Mot. For Summ. J., A1-A16 (May 6, 2014) ...........................Add. 1

Judgment, A17 (May 6, 2014) .........................................................................Add. 2

U.S. Patent No. 5,544,360, A20-A34 .............................................................Add. 3

CASE PARTICIPANTS ONLY Document: 26 Page: 69 Filed: 08/11/2014

# ADDENDUM 1

1

2

3                UNITED STATES DISTRICT COURT

4                NORTHERN DISTRICT OF CALIFORNIA

5

6    SPEEDTRACK, INC.,

7              Plaintiff,                         No. C 07-3602 PJH

8         v.                                      **ORDER GRANTING MOTION FOR**
                                                  **SUMMARY JUDGMENT**
9    OFFICE DEPOT, INC., et al.,

10             Defendants.
     _____/

11

12        Defendants Office Depot, Inc. ("Office Depot"), CDW Corporation ("CDW"), Newegg

13   Inc. ("Newegg"), and PC Connection, Inc. ("PC Connection") (together, "defendants") have

14   moved for summary judgment, claiming that the patent infringement claims asserted by

15   plaintiff SpeedTrack, Inc. ("plaintiff" or "SpeedTrack") are barred by res judicata, collateral

16   estoppel, and/or the Kessler doctrine.  The court finds that the matter is suitable for

17   decision without a hearing, and GRANTS defendants' motion for summary judgment as

18   follows.

19                          **BACKGROUND**

20        This patent infringement case involves the same plaintiff and patent as a previous

21   case heard by this court, SpeedTrack v. Wal-Mart (Case No. 4:06-cv-7336) ("the Wal-Mart

22   case").  The facts of Wal-Mart are directly relevant to the present motion, so they will be

23   briefly summarized here.

24        In the Wal-Mart case, SpeedTrack asserted a patent infringement claim against Wal-

25   Mart for certain technology used in Wal-Mart's retail web site.  Specifically, SpeedTrack

26   alleged that Wal-Mart's website allowed its users to search for products by selecting pre-

27   defined product categories, and further claimed that the technology infringed U.S. Patent

28   No. 5,544,360 ("the '360 patent").

**United States District Court**
For the Northern District of California

**A1**

United States District Court

For the Northern District of California

1    After the <u>Wal-Mart</u> complaint was filed, the company which supplied the allegedly-

2    infringing technology to Wal-Mart's website (Endeca Technologies Inc., or "Endeca")

3    intervened in the case.  After Endeca's intervention, SpeedTrack added claims of indirect

4    infringement (inducement of infringement and contributory infringement) against Endeca,

5    and continued to accuse Wal-Mart of direct infringement.  Incidentally, it was around this

6    time that SpeedTrack filed the complaint in the present case, which was stayed pending

7    final resolution of the <u>Wal-Mart</u> case.

8    The court conducted claim construction proceedings in the <u>Wal-Mart</u> case, and

9    issued a claim construction order on June 19, 2008.  The critical construction was of the

10   term "category description," which the court construed as "information that includes a name

11   that is descriptive of something about a stored file."  <u>See</u> <u>Wal-Mart</u>, Dkt. 132 at 5-9.

12   After claim construction, Endeca filed a reexamination petition with the U.S. Patent

13   and Trademark Office ("PTO"), which was granted.  The court stayed the <u>Wal-Mart</u> case

14   during the pendency of the reexamination proceedings.  The present case remained stayed

15   as well.

16   The PTO confirmed the patentability of SpeedTrack's claims, and the <u>Wal-Mart</u> case

17   proceeded to summary judgment.  Wal-Mart and Endeca moved for summary judgment of

18   non-infringement, and the court held a hearing on the motion on November 16, 2011.  As

19   part of their summary judgment motion, Wal-Mart and Endeca presented new arguments

20   on the term "category description," arguing that the accused product did not infringe

21   because it did not include a "<u>name</u> that is descriptive of something about a stored file" but

22   instead included a <u>number</u>.  The court ordered additional briefing on that non-infringement

23   argument, and during that briefing, SpeedTrack moved to amend its final infringement

24   contentions, seeking to add an allegation that Wal-Mart and Endeca infringed the "category

25   description" limitation under the doctrine of equivalents.  The court denied SpeedTrack's

26   motion for leave to amend, finding that SpeedTrack had actually been on notice of

27   defendants' non-infringement argument since June 23, 2011, when defendants served a

28   supplemental interrogatory response indicating that their software used numbers, rather

2

**A2**

than names, and thus did not meet the patent's "category description" limitation. <u>See</u> <u>Wal-Mart</u>, Dkt. 357. The court then granted defendants' motion for summary judgment of non-infringement, based on the "category description" limitation. <u>See</u> <u>Wal-Mart</u>, Dkt. 358. SpeedTrack appealed both decisions to the Federal Circuit, which affirmed this court's denial of leave to amend and grant of summary judgment of non-infringement. <u>See</u> <u>SpeedTrack v. Endeca</u>, 524 Fed.Appx. 651 (Fed. Cir. 2013).

After the Federal Circuit issued its decision, the stay was lifted in the present case, which involves allegations of infringement against defendants Office Depot, CDW, Newegg, and PC Connection, for their use of the same Endeca search technology that was at issue in <u>Wal-Mart</u>.

After the stay was lifted, defendants moved to dismiss the complaint, arguing that SpeedTrack's suit was barred by (1) res judicata, or claim preclusion, (2) collateral estoppel, or issue preclusion, and/or (3) the Supreme Court's "<u>Kessler</u> doctrine." The court denied the motion, finding that "the issues raised by defendants require consideration of materials outside of the pleadings, and thus are more appropriately raised in a motion for summary judgment." <u>See</u> Dkt. 94.

Specifically, the court found that it needed to consider evidence regarding defendants' use of the accused Endeca technology before deciding whether SpeedTrack's claims were barred. At the hearing on defendants' motion to dismiss, the court specifically asked SpeedTrack's counsel if they "needed any other discovery," to which counsel replied "for collateral estoppel, no, because I have the judgment from the first case. I have the orders." Dkt. 96 at 12. Regarding res judicata, SpeedTrack's counsel represented that they needed only limited discovery regarding any indemnification agreements between defendants and Endeca. <u>Id.</u> at 13. Towards the end of the hearing, the court told SpeedTrack's counsel that "if you need some additional discovery, you need to tell me what it is, and I'll assign a certain amount of time to complete it," and then asked "having heard the arguments, what do you need and why?" <u>Id.</u> at 24. SpeedTrack's counsel confirmed that he'd "like to have [a] deposition that we wanted to take before on these

3

**A3**

United States District Court
For the Northern District of California

1    [indemnification] agreements to know more about them and how they were being

2    performed." Id. The court then confirmed, "One deposition for each of the four defendants.

3    That's it?" to which SpeedTrack's counsel responded "yes." Id.

4         The parties then conducted discovery, and defendants now move for summary

5    judgment on the same bases asserted in their motion to dismiss. Specifically, defendants

6    argue that this court has already found that the accused Endeca technology (as used by

7    Wal-Mart) does not infringe SpeedTrack's patent, and they now present evidence that they

8    use the same Endeca technology in the same way. Defendants thus argue that

9    SpeedTrack's claims of infringement are barred by (1) res judicata, or claim preclusion, (2)

10   collateral estoppel, or issue preclusion, and/or (3) the Supreme Court's "Kessler doctrine."

11                                  **DISCUSSION**

12   A.    Legal Standard

13        A party may move for summary judgment on a "claim or defense" or "part of . . . a

14   claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is

15   no genuine dispute as to any material fact and the moving party is entitled to judgment as a

16   matter of law. Id.

17        A party seeking summary judgment bears the initial burden of informing the court of

18   the basis for its motion, and of identifying those portions of the pleadings and discovery

19   responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.

20   v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome

21   of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a

22   material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

23   verdict for the nonmoving party. Id.

24        Where the moving party will have the burden of proof at trial, it must affirmatively

25   demonstrate that no reasonable trier of fact could find other than for the moving party.

26   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where

27   the nonmoving party will bear the burden of proof at trial, the moving party may carry its

28   initial burden of production by submitting admissible "evidence negating an essential

4

**A4**

1   element of the nonmoving party's case," or by showing, "after suitable discovery," that the

2   "nonmoving party does not have enough evidence of an essential element of its claim or

3   defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co.,

4   Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S.

5   at 324-25 (moving party can prevail merely by pointing out to the district court that there is

6   an absence of evidence to support the nonmoving party's case).

7       When the moving party has carried its burden, the nonmoving party must respond

8   with specific facts, supported by admissible evidence, showing a genuine issue for trial.

9   Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material – the existence of

10  only "some alleged factual dispute between the parties will not defeat an otherwise properly

11  supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

12      When deciding a summary judgment motion, a court must view the evidence in the

13  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

14  Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

15  B.   Legal Analysis

16      1.   Res judicata

17      Res judicata, or claim preclusion, prevents relitigation of a claim that has already

18  been decided, and applies when "the earlier suit . . . (1) involved the same 'claim' or cause

19  of action as the later suit, (2) reached a final judgment on the merits, and (3) involved

20  identical parties or privies." Mpoyo v. Litton Electro-Optical Sys., 430 F.3d 985, 987 (9th

21  Cir. 2005). Because the relevant "claim" in this case is one of patent infringement, this

22  court must apply Federal Circuit law in order to determine "[w]hether two claims of

23  infringement constitute the same claim or cause of action," as required by element (1) of

24  the res judicata test. Brain Life, LLC v. Elekta Inc., -- F.3d --, 2014 WL 1139469, at *4

25  (Fed. Cir. 2014).

26      For claim preclusion to apply in a patent case, the alleged infringer must

27  demonstrate that the accused product or process in the present case is "essentially the

28  same" as the accused product/process in the earlier case. Nystrom v. Trex Co., 580 F.3d

United States District Court
For the Northern District of California

5

A5

United States District Court
For the Northern District of California

1281,1285 (Fed. Cir. 2009). However, the Federal Circuit has recently held that claim

preclusion bars only "the assertion of infringement . . . to the extent that the alleged acts of

infringement <u>predate</u> the final judgment" in the earlier case, and does not bar claims

relating to acts of infringement that post-date the judgment in the earlier case. <u>See</u> <u>Brain</u>

<u>Life</u>, 2014 WL 1139469 at *6 (emphasis added). In other words, to the extent that

SpeedTrack alleges that defendants have infringed its patent after the date of final

judgment in <u>Wal-Mart</u>, that claim cannot be barred by res judicata, "regardless of whether

the same transactional facts are present in both suits." <u>Id.</u>

The <u>Brain Life</u> court explained that "the claim that gives rise to preclusion

encompasses only the particular infringing acts that are accused in the first action or could

have been made subject to that action." 2014 WL 1139469 at *6 (citing <u>Aspex Eyewear</u>

<u>Inc. v. Marchon Eyewear, Inc.</u>, 672 F.3d 1335, 1343 (Fed. Cir. 2012)). And because any

post-judgment acts of alleged infringement could not have been raised in the first litigation,

they cannot be barred in the second litigation.

As applied to the present case, SpeedTrack's allegations of infringement extend

from July 12, 2001 (six years prior to the filing of the original complaint, as provided for by

35 U.S.C. § 286) until June 28, 2013 (the filing date of the operative First Amended

Complaint). <u>See</u> Dkt. 100 at 17. SpeedTrack divides this time period up into two

subgroups, arguing that res judicata does not apply to either, albeit for different reasons.

First, SpeedTrack argues that res judicata cannot apply to any infringement

allegations between July 12, 2001 and May 25, 2007. SpeedTrack argues that the May 25,

2007 date is significant because, on that day, SpeedTrack filed its counterclaims against

Endeca (who had intervened in the <u>Wal-Mart</u> suit). SpeedTrack argues that, during the

2001-2007 time frame, its claims against defendants "could not have been brought in the

<u>Wal-Mart</u> action . . . because SpeedTrack could not blame Wal-Mart (or Endeca) for acts

taken by Wal-Mart's competitors." Dkt. 100 at 16. However, SpeedTrack ignores

defendants' argument that they are in privity with Endeca, by virtue of their indemnification

agreements. That argument will be addressed more fully below, but if defendants are

1    correct, then SpeedTrack's claims against defendants (as privies of Endeca) can indeed be

2    barred under res judicata.

3          Second, SpeedTrack argues that, because it never supplemented its pleadings to

4    include ongoing infringing acts, "SpeedTrack's claims against Endeca ended as of May 25,

5    2007" (the date that its counterclaims against Endeca were filed). Dkt. 100 at 15-16, n.13.

6    SpeedTrack thus argues that res judicata cannot apply to any infringement allegations

7    between May 26, 2007 and June 28, 2013, because any alleged infringement occurred

8    after its claims against Endeca had already ended. Dkt. 100 at 17.

9          The court finds no support for this position, as SpeedTrack has not shown why the

10   court should afford any significance to the date of the filing of its claims against Endeca.

11   The Brain Life court was clear in holding that the only significant date, for res judicata

12   purposes, is the date of final judgment in the earlier case. 2014 WL 1139469 at *6; see

13   also Guild Wineries & Distilleries v. Whitehall Co., 853 F.2d 755, 761 (9th Cir. 1988) ("The

14   date of judgment . . . controls the application of res judicata principles."). Even though

15   SpeedTrack may have chosen not to assert claims of ongoing infringement against Endeca

16   and Wal-Mart for any alleged acts occurring after May 25, 2007, it could have asserted

17   such claims (at least through the date of final judgment), and as a result, it may still be

18   barred from asserting them now (assuming defendants are able to establish all three res

19   judicata elements). Final judgment in Wal-Mart was entered on March 30, 2012, so only

20   allegations of defendants' infringement occurring after that date are insulated from res

21   judicata, according to the principles articulated in Brain Life. As to SpeedTrack's

22   allegations of infringement between July 12, 2001 and March 30, 2012, those claims may

23   still be barred by res judicata.

24         As discussed above, for res judicata to apply, defendants must show (1) that this

25   case involves the same claim or cause of action as Wal-Mart, (2) that Wal-Mart resulted in

26   a final judgment on the merits, and (3) that Wal-Mart and this case involve identical parties

27   or privies.

28         As to element (1), the court first notes that SpeedTrack accuses defendants of

7

United States District Court
For the Northern District of California

1    infringement based on their use of the same Endeca technology that was found to be non-

2    infringing in <u>Wal-Mart</u>.  Defendants have presented evidence to show that each of them

3    uses the Endeca platform in "essentially the same" way as Wal-Mart, and focus on the fact

4    that they, like Wal-Mart, use numbers (rather than names) as a category descriptor.  <u>See</u>

5    Dkt. 98, Exs. D, E (CDW) (attaching human-readable version of Endeca file and declaring

6    that "CDW does not change the format of the identified numeric field(s) in the Endeca file(s)

7    identified above to be anything other than numeric"); Exs. F, G (Newegg) (attaching

8    human-readable version of Endeca file and declaring that "Newegg does not change the

9    format of the identified numeric fields in the Endeca file(s) identified above to be anything

10   other than numeric"); Exs. H, I (Office Depot) (attaching human-readable version of Endeca

11   file and declaring that "Office Depot does not change the format of the identified numeric

12   fields in the Endeca file(s) identified above to be anything other than numeric"); Exs. J, K

13   (PC Connection) (attaching human-readable version of Endeca file and declaring that "PC

14   Connection does not change the format of the identified numeric field(s) in the Endeca

15   file(s) identified above to be anything other than numeric").

16          Having reviewed the evidence submitted by defendants, the court finds that

17   defendants, like Wal-Mart, use numbers rather than names as category descriptors.  The

18   court also notes that SpeedTrack has failed to rebut defendants' evidence, showing that

19   their use of Endeca's technology is "essentially the same" as Wal-Mart's, with any evidence

20   of its own showing that defendants use the technology in a materially different way.  As

21   discussed above, at the hearing on defendants' motion to dismiss, SpeedTrack's counsel

22   represented that they had all the discovery needed for collateral estoppel purposes, and

23   needed only a small amount of discovery, relating to the indemnification agreements

24   between defendants and Endeca, as relevant to defendants' res judicata defense.

25   SpeedTrack then deposed a representative of each defendant, and in addition to asking

26   about the indemnification agreements, SpeedTrack also asked each defendant about its

27   specific implementation of the Endeca platform.  <u>See</u> Dkt. 100, Ex. 5 (deposition transcript

28   of PC Connection's Steven C. Young); Ex. 6 (deposition transcript of Newegg's Robert

8

Wang); Ex. 7 (deposition transcript of Office Depot's Ancin Peter), Ex. 8 (deposition of CDW's Aric Lazar). Despite this deposition testimony, SpeedTrack has failed to identify any material differences between defendants' use of the Endeca platform and Wal-Mart's non-infringing use of the same platform. Instead, SpeedTrack relies on mere generalities, arguing that this suit involves "different activities," "different transactional facts," and "different users, methods, websites, software, and time periods." Dkt. 100 at 1. However, in the absence of any evidence that these differences are material, the court finds that defendants' use of the Endeca software is "essentially the same" as Wal-Mart's, and thus fails to literally infringe the patent-in-suit for the same reason.

SpeedTrack then argues that, even if its claims of literal infringement are barred, it may still assert claims of infringement under the doctrine of equivalents, because those claims were not asserted in <u>Wal-Mart</u>. However, res judicata "bars both claims that were brought as well as those that <u>could have been</u> brought." <u>Brain Life</u>, 2014 WL 1139469, at *5 (emphasis in original) (citing <u>Mars Inc. v. Nippon Conlux Kabushiki-Kaisha</u>, 58 F.3d 616, 619-20 (Fed. Cir. 1995)). And the court finds that, even though SpeedTrack did not assert infringement under the doctrine of equivalents in <u>Wal-Mart</u>, it certainly could have. In fact, in the <u>Wal-Mart</u> case, SpeedTrack waited until after Wal-Mart had moved for summary judgment and after the court had held a hearing on the motion, and only then filed a motion for leave to amend its infringement contentions, seeking to add the doctrine of equivalents theory. The court denied SpeedTrack's motion, noting that it had waited almost six months after learning of Wal-Mart's non-infringement theory (via an interrogatory response) before seeking leave to amend its infringement contentions, and was thus unable to establish diligence. <u>See Wal-Mart</u>, Dkt. 357 (aff'd by <u>SpeedTrack v. Endeca</u>, 524 Fed.Appx. at 659). Thus, the court finds that SpeedTrack could have asserted infringement under the doctrine of equivalents in <u>Wal-Mart</u>. Accordingly, defendants have shown that this case involves the same claims that were involved in <u>Wal-Mart</u>, meeting element (1) of the test for applying res judicata.

SpeedTrack does not dispute that <u>Wal-Mart</u> resulted in a final judgment on the

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

1    merits, and thus, element (2) of the res judicata test is met here.

2         As to element (3), defendants argue that they are in privity with Endeca (a defendant

3    in Wal-Mart) by virtue of their indemnification agreements.  Each defendant has an

4    indemnification agreement with Endeca whereby Endeca is obligated to "indemnify, defend,

5    and hold harmless" the defendant for any loss arising out of a claim that the Endeca

6    software "infringe[s] on the Intellectual Property Rights of any third party."  See Dkt. 98, Ex.

7    L (CDW), Ex. M (Newegg), Ex. N (Office Depot), and Ex. O (PC Connection).  Neither party

8    has presented Ninth Circuit authority on the issue of whether an indemnification agreement

9    is sufficient to meet the "privity" requirement, but defendants do cite one out-of-district case

10   with similar facts.  See Global Maintech Corp. v. AIG Technologies, Inc., 2006 WL 354224

11   (D. Minn. Feb. 15, 2006).

12        In Global Maintech (as in this case), a patent holder first asserted infringement

13   claims against the developer of a software program (I/O Concepts), and then asserted

14   infringement claims against a user of the same software program (AIG Technologies).  The

15   court held as follows:

16

17        AIG is being sued in its capacity as a user of I/O Concepts' products, and
     plaintiffs were aware of AIG's use of I/O Concepts' products during the

18   pendency of the I/O Concepts Action.  Moreover, I/O Concepts is
     contractually obligated to and is controlling AIG's defense of the Present

19   Action.  In light of these facts, the court concludes that I/O Concepts and AIG
     are in privity with one another for purposes of this litigation . . . Thus, AIG has,

20   as a matter of law, satisfied its burden of establishing this part of the third
     element of res judicata.

21   2006 WL 354224, at *3.

22        SpeedTrack counters by pointing to another provision in each of the indemnification

23   agreements, stating that "[n]othing contained in this Agreement shall be deemed to imply or

24   constitute that either Party is the agent or representative of the other Party, or that both

25   parties are joint ventures or partners for any purpose."  Dkt. 100, Ex. 21 at § 12.10 (Office

26   Depot); Ex. 22 at § 12.10 (PC Connection); Ex. 23 at § 12.10 (Newegg); and Ex. 24 at §

27   12.10 (CDW) (emphasis added by SpeedTrack).  SpeedTrack further points out that

28   defendants have repeatedly redacted these provisions when filing the agreements with the

10

A10

1   court.

2       While the court agrees with SpeedTrack that section 12.10 should not have been

3   redacted from defendants' filings, the court finds that this section does not undermine the

4   persuasive effect of Global Maintech.  Section 12.10 merely sets an outer limit on the

5   relationship between Endeca and defendants – while Endeca is obligated to indemnify

6   defendants for any losses incurred in intellectual property suits such as this (pursuant to

7   section 9 of the contract), it does not represent them in any broader manner (e.g., Endeca

8   cannot enter into contracts on behalf of defendants, or vice versa).  The court finds that, for

9   the purposes of the privity analysis, only the parties' relationship with respect to the

10  relevant lawsuits matters.  See Transclean Corp. v. Jiffy Lube Int'l, Inc., 474 F.3d 1298,

11  1306 (Fed. Cir. 2007) ("privity exists when the parties are so closely related and their

12  interests so nearly identical that it is fair to treat them as the same parties for the purposes

13  of determining the preclusive effect of the first judgment.") (emphasis added); see also In re

14  Schimmels, 127 F.3d 875, 881 (9th Cir. 1997) ("Privity – for the purposes of applying the

15  doctrine of res judicata – is a legal conclusion designating a person so identified in interest

16  with a party to former litigation that he represents precisely the same right in respect to the

17  subject matter involved.") (emphasis added).  Again, the court notes that defendants have

18  unnecessarily complicated the issue by attempting to hide section 12.10 of the

19  indemnification agreements, but even after considering that provision, the court finds that

20  the reasoning of Global Maintech is persuasive, and thus applies it to this case.  Because

21  Endeca is contractually obligated to indemnify defendants for any losses stemming from a

22  finding of infringement, the court finds that the parties are in privity[1], and thus element (3) of

23  _____

24      [1]The court also notes that SpeedTrack, in an attempt to prevent defendants from
    presenting new arguments on claim construction, has argued that "Endeca adequately and
25  fully represented defendants' interests in the earlier claim construction proceedings and that
    this court's prior rulings . . . will apply."  Dkt. 59 at 7.  SpeedTrack also sought to prevent
26  defendants from raising certain affirmative defenses that were raised in Wal-Mart, arguing that
    it "may file a motion seeking a ruling that defendants are in privity with Endeca and therefore
27  collateral estoppel applies to the court's claim constructions and its grant of partial summary
    judgment on defendants' section 102(a) and 102(b) defenses in the Walmart.com action."  Id.
28  at 8.  SpeedTrack appears to take the position that the privity requirement is met when it

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    the res judicata test is met.

2          Accordingly, to the extent that SpeedTrack's claims of infringement are based on

3    acts occurring on or prior to March 30, 2012 (the date of final judgment in <u>Wal-Mart</u>), the

4    court finds that they are barred by principles of res judicata.

5          2.    Collateral estoppel

6          The application of collateral estoppel is appropriate only where (1) there was a full

7    and fair opportunity to litigate the identical issue in the prior action, (2) the issue was

8    actually litigated, (3) the issue was decided in a final judgment, and (4) the party against

9    whom issue preclusion is asserted was a party or in privity with a party to the prior action.

10   <u>Syverson v. Int'l Business Machines Corp.</u>, 472 F.3d 1072, 1078 (9th Cir. 2007).

11         The court need not address all four elements here, because it finds that defendants

12   are unable to meet element (2).  While SpeedTrack <u>could have</u> raised its theory of

13   infringement under the doctrine of equivalents in <u>Wal-Mart</u> (for the reasons discussed

14   above), its lack of diligence in asserting that theory prevented it from <u>actually</u> raising the

15   issue in <u>Wal-Mart</u>.  Thus, the court finds that the issue of infringement under the doctrine of

16   equivalents was not "actually litigated," and thus, collateral estoppel does not bar

17   SpeedTrack's claims that defendants infringed the patent-in-suit under the doctrine of

18   equivalents.

19         3.    <u>Kessler</u> doctrine

20         The <u>Kessler</u> doctrine is based on the Supreme Court case of <u>Kessler v. Eldred</u>, 206

21   U.S. 285 (1907).  In <u>Kessler</u>, the owner of a patent related to electric lighters (Eldred) filed

22   an infringement suit against a competitor in the lighter business (Kessler).  Kessler, the

23   alleged infringer, succeeded in proving that his lighter did not infringe Eldred's patent.

24   Eldred then filed suit against a customer of Kessler's, who sold the same lighters that were

25   at issue in the first action.  Kessler intervened to indemnify his customer, and also filed a

26

27   _____

28   comes to favorable rulings, but is not met when it comes to unfavorable rulings.  SpeedTrack
     cannot have it both ways.

United States District Court

For the Northern District of California

1    separate suit against Eldred, seeking to enjoin Eldred from asserting infringement suits

2    against any of his customers for the use of the same lighter that had already been

3    adjudged to be non-infringing.

4         The Supreme Court agreed with Kessler, and found that the final judgment in the

5    first case "settled finally and everywhere . . . that Kessler has the right to manufacture, use,

6    and sell" his electric lighter.  206 U.S. at 288.  In other words, by prevailing in the first suit,

7    Kessler had immunized his electric lighter from any future infringement suits brought by

8    Eldred.  Kessler was thus free to sell his lighters to other retailers, who could now re-sell

9    the Kessler lighters without fear of an infringement suit brought by Eldred.

10        SpeedTrack correctly notes that Kessler was decided in 1907, before the Supreme

11   Court had recognized the principle of non-mutual collateral estoppel.  In SpeedTrack's

12   view, the development of non-mutual collateral estoppel has now made the Kessler

13   doctrine obsolete, because any sellers of a product deemed to be non-infringing can now

14   rely on collateral estoppel to bar a suit brought by the patent holder, by establishing the four

15   factors articulated above (that (1) there was a full and fair opportunity to litigate the identical

16   issue in the prior action, (2) the issue was actually litigated, (3) the issue was decided in a

17   final judgment, and (4) the patent holder was a party or in privity with a party to the prior

18   action).  SpeedTrack points to the fact that, at the time that its opposition brief was filed,

19   "the Federal Circuit has applied Kessler effectively only once in its past thirty years of

20   published decisions."  Dkt. 100 at 2 (emphasis in original).

21        However, the Federal Circuit has very recently issued another to-be-published

22   decision demonstrating that Kessler is still in force, and specifically finding that it "precludes

23   some claims that are not otherwise barred by claim or issue preclusion."  Brain Life, 2014

24   WL 1139469 at *8.  The Brain Life court acknowledged that the Kessler doctrine's "viability

25   under current estoppel law may be of less value now than it was at the time it was handed

26   down," but ultimately concluded that it "exists" and was "directly applicable to the case at

27   bar."  Id. at *10-11.

28        In Brain Life, the plaintiff in a prior litigation (Medical Instrumentation Diagnostics

13

**A13**

1  Corporation, or "MIDCO") had accused defendant Elekta of infringing its patent.

2  Specifically, MIDCO accused Elekta of infringing both the patent-in-suit's apparatus claims

3  and its method claims.  2014 WL 1139469 at *1 (internal citation omitted).  However, as the

4  case progressed, MIDCO focused on its apparatus claims and neglected the method

5  claims.  Id. at *2.  Only terms from the apparatus claims were construed by the district

6  court, and just before trial, Elekta requested that the court dismiss the method claims from

7  the case.  Id.  MIDCO did not oppose the request, and the court dismissed the method

8  claims without prejudice.  Id.  At trial, the jury found that Elekta did infringe the apparatus

9  claims, but on appeal, the infringement finding was reversed, and the case was remanded

10  so that the district court could enter a judgment of non-infringement as a matter of law.  Id.

11  at *2.

12      On remand, MIDCO attempted to revive the method claims that had been dismissed

13  from the suit.  2014 WL 1139469 at *3.  However, the district court refused to reopen the

14  case and entered final judgment in favor of Elekta.  Id.  MIDCO appealed that refusal, but

15  the Federal Circuit affirmed the decision not to reopen the case.  Id.

16      After the MIDCO suit ended, MIDCO licensed the patent-in-suit to another company,

17  which then licensed the patent to Brain Life.  2014 WL 1139469 at *3.  Brain Life then filed

18  suit against Elekta, seeking to assert the method claims that were dismissed prior to trial in

19  the MIDCO case.  Id.  The district court in the Brain Life case ordered discovery on the

20  issue of whether the accused products were "essentially the same" as the accused

21  products in MIDCO, and after Elekta presented evidence that the products were materially

22  the same, the court granted summary judgment based on res judicata.  Id.

23      On appeal, the Federal Circuit reversed the district court's decision to the extent that

24  it was based on res judicata, but it found that Brain Life's claims were barred based on the

25  Kessler doctrine.  2014 WL 1139469 at *7, 11.  The court found that "once the accused

26  devices in the MIDCO litigation were adjudged to be noninfringing with respect to the

27  asserted claims and judgment was entered as to all claims, Elekta was free to continue

28  engaging in the accused commercial activity as a non-infringer."  Id. at *11.  The court also

14

**A14**

United States District Court

For the Northern District of California

1    emphasized that "[w]hile MIDCO ultimately abandoned the method claims prior to trial, it

2    could have continued to assert those claims." Id. Thus, "by virtue of gaining a final

3    judgment of non-infringement in the first suit – where all of the claims were or could have

4    been asserted against Elekta – the accused devices acquired a status as non-infringing

5    devices, and Brain Life is barred from asserting that they infringe the same patent claims a

6    second time." Id.

7        The Brain Life court emphasized that the applicability of the Kessler doctrine

8    depends on the specific accused product, not on the identity of the party seeking to invoke

9    the doctrine:

10       [W]hen an alleged infringer prevails in demonstrating noninfringement, the
         specific accused device(s) acquires the "status" of a noninfringing device. . .
11       The status of an infringer is derived from the status imposed on the thing that
         is embraced by the asserted patent claims. And, when the devices in the first
12       and second suits are "essentially the same," the "new" product(s) also
         acquires the status of a noninfringing device vis-à-vis the same accusing
13       party or its privies.

14   2014 WL 1139469 at *10 (emphasis in original) (internal citations omitted).

15       The court finds that the Kessler doctrine, as applied by the Brain Life court, is

16   directly applicable to this case. By virtue of the Wal-Mart decision, the accused Endeca

17   technology acquired the status of a non-infringing product. And defendants in this case

18   have shown that their implementation of the Endeca software is "essentially the same" as

19   the implementation adjudged to be non-infringing in Wal-Mart – specifically, defendants

20   have shown that they use numbers, rather than names, as category descriptors.

21   SpeedTrack has had an opportunity to rebut defendants' showing, and has taken discovery

22   regarding defendants' use of the Endeca software (despite representing to the court that it

23   needed no discovery on the issue), but has been unable to identify any material differences

24   between defendants' use of the software and Wal-Mart's non-infringing use of the same

25   software. SpeedTrack largely relies on the argument that it has not yet litigated the issue

26   of whether defendants' use of the Endeca technology infringes under the doctrine of

27   equivalents, but the Federal Circuit has made clear that the Kessler doctrine bars all

28   subsequent assertions of the same patent. 2014 WL 1139469 at *11 (accused products

15

**A15**

United States District Court

For the Northern District of California

1   "have acquired the status of noninfringing products as to the '684 patent, i.e., all claims that

2   were brought or could have been brought in the first suit.") (emphasis in original).

3   Certainly, if the Kessler doctrine bars the assertion of new claims, it must also bar the

4   assertion of new theories involving the same, already-asserted claims.

5          In short, by failing to prevail in its infringement suit against Wal-Mart, SpeedTrack

6   lost the right to assert any claims of the '360 patent against any customers of Endeca who

7   use the accused software in "essentially the same" manner as did Wal-Mart. Defendants

8   have shown that they do indeed use the software in "essentially the same" way, and as a

9   result, the entirety of SpeedTrack's suit is barred by the Kessler doctrine.

10         4.      Motion to seal

11         In connection with its opposition brief, SpeedTrack filed a motion to seal portions of

12  its brief and certain exhibits containing defendants' confidential information. Defendants

13  did not file a supporting declaration, as required by Civil Local Rule 79-5(e), "establishing

14  that all of the designated material is sealable." As a result, the motion to seal is DENIED,

15  and SpeedTrack is directed to file unredacted versions of its opposition brief and supporting

16  exhibits no later than **May 13, 2014**.

17                                        **CONCLUSION**

18         Having found that SpeedTrack's infringement claims are barred by res judicata, to

19  the extent that they cover alleged acts occurring on or before March 30, 2012, and having

20  found that SpeedTrack's infringement claims are wholly barred by the Kessler doctrine, the

21  court hereby GRANTS defendants' motion for summary judgment as to all claims asserted

22  by SpeedTrack.

23

24         **IT IS SO ORDERED.**

25  Dated: May 6, 2014

26                                        _____
                                          PHYLLIS J. HAMILTON
27                                        United States District Judge

28

16

**A16**

CASE PARTICIPANTS ONLY Document: 26 Page: 86 Filed: 08/11/2014

# ADDENDUM 2

1

2

3                    UNITED STATES DISTRICT COURT

4                    NORTHERN DISTRICT OF CALIFORNIA

5

6  SPEEDTRACK, INC.,

7              Plaintiff,                    No. C 07-3602 PJH

8         v.                                 **JUDGMENT**

9  OFFICE DEPOT, INC., et al.,

10             Defendants.
   _____/

11

12         The court having granted defendants' motion for summary judgment,

13       it is Ordered and Adjudged

14       that judgment is entered in favor of defendants Office Depot, Inc., CDW Corporation,

15  Newegg Inc., and PC Connection, Inc., and against plaintiff SpeedTrack, Inc., on the claims

16  asserted against them.

17

18       **IT IS SO ORDERED.**

   Dated:  May 6, 2014

19                                           _____

20                                           PHYLLIS J. HAMILTON
                                             United States District Judge

21

22

23

24

25

26

27

28

**A17**

# ADDENDUM 3

US005544360A

# United States Patent [19]

## Lewak et al.

| | |
|---|---|
| [11] Patent Number: | **5,544,360** |
| [45] Date of Patent: | **Aug. 6, 1996** |

[54] **METHOD FOR ACCESSING COMPUTER FILES AND DATA, USING LINKED CATEGORIES ASSIGNED TO EACH DATA FILE RECORD ON ENTRY OF THE DATA FILE RECORD**

[75] Inventors: **Jerzy Lewak**, Del Mar; **Slawek Grzechnik**, La Mesa; **Jon Matousek**, San Diego, all of Calif.

[73] Assignee: **Paragon Concepts, Inc.**, Solana Beach, Calif.

[21] Appl. No.: **384,379**

[22] Filed: **Feb. 3, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 980,620, Nov. 23, 1992, abandoned.

[51] Int. Cl.⁶ ................................................ G06F 17/30

[52] U.S. Cl. .............. **395/600**; 364/253; 364/253.3; 364/282.1; 364/282.3; 364/283.1; 364/283.2; 364/283.3; 364/286.4; 364/286.5

[58] Field of Search ............................ 364/282.1, 282.3, 364/283.1, 283.2, 283.3, 286.4, 286.5

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,047,918 | 9/1991 | Schwartz et al. ..................... | 364/200 |
| 5,115,504 | 5/1992 | Belove et al. ....................... | 395/600 |
| 5,162,992 | 11/1992 | Williams ............................ | 364/419 |
| 5,201,047 | 4/1993 | Maki et al. ......................... | 395/600 |
| 5,201,048 | 4/1993 | Coulter et al. ...................... | 395/600 |
| 5,204,947 | 4/1993 | Bernstein et al. .................... | 395/157 |
| 5,206,949 | 4/1993 | Cochran et al. ...................... | 395/600 |
| 5,276,867 | 1/1994 | Kenley et al. ....................... | 395/600 |

### OTHER PUBLICATIONS

Van Kir., "Lotus, Traveling Software Tackle DOS File Management Problems", Apr. 1989, V2R4 p. 35(2) PC-Computing.

PC Tools DOS & Shell/File Manager, 1991, pp. 33–35, (Version 7 For DOS) Central Point Software Inc.

Central Point Software Inc. PC Tools Data Recovery And Systems Utilties, 1991, pp. 95–97 (Ver. 7 For DOS).

Thought Pattern Handbook, By Bananafish Software, Inc., 1991 San Francisco, CA.

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Jack M. Choules
*Attorney, Agent, or Firm*—Fish & Richardson P.C.

[57] **ABSTRACT**

A computer filing system for accessing files and data according to user-designated criteria. The system allows the user to define a virtually unlimited number of hybrid folders by describing, using terms of their own selection, the file contents of those files which are to belong to particular hybrid folders. Such hybrid folders can be implemented on top of, and used in addition to, the normal hierarchical structured directory, or they may replace such normal structures entirely. The inventive computer file control system could therefore be used as the basis of a new computer operating system. In the process of search and retrieval, the invention ensures in two ways that the user defines a filter which will always find at least one file. The user is not required to type the key words to search but instead chooses the words from pick lists, making mistyping impossible. As the user builds the search filter definition, categories which would find no data are automatically excluded as pick list possibilities.

**21 Claims, 4 Drawing Sheets**



Case: 14-14... Case: 14-1475 Document: ... Page: ... Filed: 08/11/2014



FIG. 1
(PRIOR ART)

# FIG. 2



| FILE_TYPE | CONTENTS | ACTION | NAMES |
|---|---|---|---|
| 000 AGREEMENT | 100 ADDRESSES | 200 ADVANCES | 300 JONES |
| 001 COMPARISON | 101 FEATURES | 201 BETA TESTING | 301 MACQWERTY |
| 002 DOCUMENTATION | 102 INVITATION | 202 BUGS | 302 MACTAG |
| 003 E- MAIL | 103 OFFICE | 203 COMPUTERS | 303 MCARTHY |
| 004 LEGAL | 104 PLAN | 204 DEMOS | 304 NISUS |
| 005 LETTER | 105 PROGRAMMING | 205 EMPLOYEES | 305 PETER |
| 006 LIST | 106 PROMOTION | 206 PATENT | 306 PUP |
| 007 MACRO | 107 REQUEST | 207 RECEIVED | 307 SMITH |
| 008 MEMOS | 108 RESEARCH | 208 REPLY | 308 SOLO WRITER |
| 009 MINUTES | 109 SALES | 209 SENT | 309 TECHFONTS |
| 010 NEWS RELEASE | 110 TELEPHONE #S | 210 TO SEND | 310 THOMPSON |
| • | • | • | • |
| • | • | • | • |
| • | • | • | • |

## FIG. 3

| FILE_NAME | FILE_LOC | DATE/TIME | NO_CATEGORIES | CATEGORY_ARRAY |
|---|---|---|---|---|
| jones.mem | c:\memos | 01-01-80 01:30 | 2 | 008, 300 |
| minutes.1 | f:\wpdocs | 10-10-90 10:10 | 3 | 009, 103, 109 |
| • | • | • | • | • |
| • | • | • | • | • |
| • | • | • | • | • |

## FIG. 4

Exhibit 1, Page 24



FIG. 5

5,544,360

**1**

METHOD FOR ACCESSING COMPUTER
FILES AND DATA, USING LINKED
CATEGORIES ASSIGNED TO EACH DATA
FILE RECORD ON ENTRY OF THE DATA
FILE RECORD

This is a continuation of application Ser. No. 07/980,620
filed on Nov. 23, 1992, now abandoned.

NOTICE OF COPYRIGHTS

A portion of the disclosure of this patent document
contains material which is subject to copyright protection.
The copyright owner has no objection to the facsimile
reproduction by any one of the patent disclosure, as it
appears in the Patent and Trademark Office patent files or
records, but otherwise reserves all copyright rights whatso-
ever.

BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates generally to computer file control
systems, and more specifically to a flexible system for
accessing computer files and data therein according to
user-designated criteria.

2. Description of Related Art

Many currently-existing computer file control systems
employ a hierarchical filing structure. This system emulates
commonly-used paper filing systems, but is more general
and is capable of more extensive use. Thus, for example, in
a paper filing system, a filing cabinet may contain 4 or 5
drawers. Each drawer may contain perhaps a dozen or so
hanging files and each file may contain one or two file
folders. Typically, a hanging file can only hold a very small
number of file folders before it becomes unmanageable, so
that a new hanging file needs to be started.

A typical computer system organizes data into files
(analogous to papers in a paper filing system) and directories
(analogous to file folders and hanging files). Indeed, in
graphically-oriented computer systems, directories are
sometimes known as "folders." Directories may contain
other directories (also referred to as subdirectories) and
files.

FIG. 1 shows a simplified typical hierarchical tree-type
directory structure. This structure is called "tree" because it
looks like an upside-down tree, with the base, or "root" of
the tree at the top. Subdirectories are often referred to as
"branches" of the tree, and files are often referred to as
leaves of the tree.

In FIG. 1, the root directory 100 contains a number of
subdirectories 102–112 and files 114–122. The subdirecto-
ries 102–112 may contain other subdirectories and files, and
so on.

In typical use, directories often contain files having simi-
lar kinds of data. Also, the name of the directory is typically
selected to be descriptive of the kinds of files and directories
therein. For example, a WPDOCS directory 102 might
contain wordprocessing documents and directories for hold-
ing specific categories of such documents. For example, a
LETTERS directory 108 may contain only files which are
letters: "LETTER TO AUTO CLUB" 114, "LETTER TO
BOWLING LEAGUE MEMBERS" 116, "LETTER TO
MR. CHISOLM" 118, "LETTER TO MR. DITHERS" 120,
and "LETTER TO MS. ENGELMAN" 122. Memos could
be stored in a "MEMOS" subdirectory 110, patent applica-
tions in an "APPLICATION" subdirectory 112, etc.

**2**

Custom structures of such directories are created so as to
make the storing and retrieval of files convenient. If the
number of files to be stored is small and the number of
different file kinds is either small or very well defined, this
type of file storage structure works well. However, several
problems arise when the number of files becomes large, or
if the file categories are not well-defined. In such cases, the
hierarchical filing structure becomes very cumbersome to
use for the following reasons:

1. The tree becomes quite deep, and so it takes more time
to get to the end of any branch.

2. It becomes more difficult for the user to decide where
to store a particular file.

As a result, finding particular files becomes harder and
harder. Frequently, the user is not able to clearly and
unambiguously associate a desired file with any one direc-
tory. In fact, the user often associates a file with several
subdirectories. This happens both when a file is being saved
and when it is being retrieved. The same problem arises in
paper filing systems. Quite often a document may logically
belong within many different folders, with the result that it
is difficult to find a desired document once the document has
been filed.

Clearly, a hierarchical topic-oriented file structure is too
rigid for many applications where information must be
organized into files. It has been found that users generally
think in terms of overlapping categories or descriptions of
file content, rather than in very strictly-defined, non-over-
lapping topics.

For example, referring now to FIG. 2, a root directory 200
has five subdirectories 202–210. In this example, subdirec-
tory 202 has three "sub"-subdirectories 212–216, subdirec-
tory 204 has two "sub"-subdirectories 218–220, subdirec-
tory 206 has one "sub"-subdirectory 222, and subdirectory
208 has one "sub"-subdirectory 224. A file might logically
belong in subdirectory 204, sub-subdirectory 214, sub-
subdirectory 216, and sub-subdirectory 224. Similarly,
another file might logically belong in subdirectory 206 and
subdirectory 208.

Therefore, what is really needed are "hybrid" logical
directories or folders, which contain those files whose con-
tent overlaps more than one physical directory. Thus, in the
present example, a first hybrid logical directory 226 would
contain each file that logically belongs in subdirectory 206
and subdirectory 208. Similarly, a second hybrid logical
directory 228 would contain each file that logically belongs
in subdirectory 204, sub-subdirectory 214, sub-subdirectory
216, and sub-subdirectory 224.

In the typical hierarchical directory structure illustrated in
FIG. 1, "hybrid" directories are not possible. Thus, it is very
desirable to provide a method for accessing files consonant
with the way users think of them, and not limited to how
such files are stored in the computer.

Some systems have been developed to overcome the
rigidity of typical hierarchical directory structures, but these
systems have limitations. In one such method, all the words
in a file are indexed and a concordance list associated with
each file is created. The user then may search for files by file
word content by defining "search filters", which are search
terms in logically defined combinations (e.g., a search filter
comprising "Smith" AND "tooling" would locate all docu-
ments having both the word "Smith" and the word "tool-
ing"). However, this indexing method has the following
shortcomings:

1. The words inside a document often do not identify the
type of document. For example, a document which is a
letter generally does not contain the word "letter".

5,544,360

**3**

Thus, a search for all documents that are letters will only identify documents which contain the word "letter". Similarly, it is very difficult to identify words which occur in all letters. Furthermore, this technique requires the user to remember precise words appearing in the file. This may be especially difficult for older files for which the user cannot recall the precise contents.

2. In applications where such a method might be most useful, the search is very time consuming. If the number of files is very large, the concordance list also is very large. A partial solution to this has been to have the program continually work in the background updating the concordance list as changes are made in the files. However, this process generally disrupts a user's activity.

3. Many files (such as binary files) contain information which is in a form that is not easily interpreted by the human mind. Such files cannot be stored and retrieved by these methods.

4. In preparing a search filter, a user must type the word or words targeted in the search. In such situations, the user commonly mistypes or use a different inflection, spelling or grouping of the key words. Without using the precise words as they appear in the files, a search has an even lower probability of success.

5. Because a user may change the contents of documents, the index of words must be constantly updated. This process is time consuming and distracting. In contrast, the topical description of a document changes very little, if at all, during its lifetime.

Because of these problems, the above methods are generally used in only "last resort" searches. Thus, the user is left to negotiate the hierarchical directory structure.

Databases and outlining programs also provide methods for data storage, retrieval, or re-organization. Databases may be created using relational techniques. In relational databases, the relationships between data are typically included in the database structure. Searches in a relational database may be made by creating a search of the relations. However, database searches are usually restricted in two ways: by the field of each data element and by the content of each field. In outlining programs and other thought-organization programs, the data is generally required to be hierarchically organized at the time of data entry.

Accordingly, it would be desirable to provide a method for accessing files which provides intuitive access by user-defined topics. Such a solution should provide: easy access to a large number of files and to files having overlapping categories; simple access to files stored in a hierarchical file system without the necessity of sorting through multiple levels; access to files using predefined categories descriptive of the contents of the files; access to files which permits a user to create a search filter of categories of files using precise category names to which the files belong; and a method of accessing files which is unaffected by changes in file contents.

The present invention provides such a method.

## SUMMARY OF THE INVENTION

The invention comprises a computer file control system, with a suitable user interface, implemented as a software program, which allows total freedom from the restrictions imposed by hierarchical and other present day computer filing systems.

The invention allows a user to define categories for files stored in a computer system, and to edit such categories as they are used, to designate all applicable categories for each file, and to link categories in user-definable ways. The invention further allows a user to be reminded of linked categories.

In the process of search and retrieval, the invention overcomes the problem of search filter definition, ensuring that the user defines a filter which will always find at least one file, thus avoiding wasting time in searching for data that cannot be matched. This is achieved in two ways. First, the user is not required to type the key words to search; instead, the user simply chooses the words from pick lists, making mistyping impossible. Second, as the user builds the search filter definition, categories which would find no data are automatically excluded as pick list possibilities.

More particularly, the invention allows users to define an unlimited number of their own "hybrid folders" by simply describing, using categories the user defines, the file contents of those files which are to belong to each "hybrid folder". This description is dynamic (that is, changeable by the user from time to time), and may be either totally unrestricted or restricted to a particular directory or subdirectory, as the user chooses. Such hybrid folders can be implemented on top of, and used in addition to, the normal hierarchical structured directory, or they may replace such normal structures entirely. The inventive computer file control system could therefore be used as the basis of a new computer operating system.

The details of the preferred embodiment of the present invention are set forth in the accompanying drawings and the description below. Once the details of the invention are known, numerous additional innovations and changes will become obvious to one skilled in the art.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a tree diagram illustrating the organizational structure of a typical prior art computer filing system.

FIG. **2** is a tree diagram illustrating the organizational structure of the computer filing system of the present invention.

FIG. **3** shows an example of a File Category Table in accordance with the present invention.

FIG. 4 shows an example of a File Information Directory in accordance with the present invention.

FIG. **5** shows an example of a Categories Window and File Window in accordance with the present invention.

Like reference numbers refer to like elements in the drawings.

## DETAILED DESCRIPTION OF THE ILLUSTRATED EMBODIMENTS

Throughout this description, the preferred embodiment and examples shown should be considered as exemplars, rather than as limitations on the present invention.

The present invention consists of a computer file control system the includes a File Category Table ("FCT") and a File Information Directory ("FID") to store information about user-defined categories and information linking such categories to specific files. The invention uses the information stored in the FCT and FID to quickly and easily access files in the file system. (The term "file" should be understood to mean any collection of data or information stored on a computer system). In the preferred embodiment, the invention includes a graphical user interface for defining catego-

5,544,360

5

ries, associating files with particular categories, and defining search filters.

File Category Table Structure

In the preferred embodiment, the FCT is a table that can be modeled as having a set of columns labeled by category-type (e.g., FILE_TYPE, CONTENTS, ACTION, etc.), with entries comprising lists of category names or descriptions (e.g., the FILE_TYPE column might have entries for AGREEMENTS, E-MAIL, MEMOS, NEWSLETTER, etc.). Each category description is a descriptive name defined by the user.

In addition, each category description is preferably associated with a unique identifier (preferably a number, but other identifiers could be used). The identifier is created by the computer (e.g., in sequential order) and used internally to manage the categories. If a user changes the name of a category description, the associated identifier is not changed. However, the invention could be implemented without using identifiers, although changes to category descriptions would then require more maintenance of the FID than with identifiers.

In the preferred embodiment, the identifier is coded so that the initial digit indicates the category type (e.g., "0xx" indicates the first category type, FILE_TYPE). This aspect is not an essential feature of the implementation of the invention, but helps the program determine, without the need of any other data fields, the column of each category description.

In the preferred embodiment, the user is provided with an FCT containing sample category descriptions. These category descriptions may be changed or deleted, and new categories may be added.

FIG. 3 shows an example of a File Category Table in accordance with the present invention. Category types 1 are at the head of each column, and each column entry comprises a category description 2 and an associated identifier 3. Of course, in implementing the invention, the table structure shown can be configured in any desired manner, such as an array, linked list, fixed or variable record length table using sequential or hashed access, etc.

In the preferred embodiment under the Apple Macintosh® System 7 operating system, category descriptions are stored as records of a random access data base file. The preferred name of the file is "FC Categories". Records are accessed by record number, in known fashion. In the preferred embodiment, category descriptions are stored in the following data structure:

```
typedef struct FC_CATEG_REC {
    LONG rec_no;                    this record number
    CATEG_SYM sym;                  category identifier
    CATEG_NAME name;                category name
    INT list;                       list to which the category
                                    belongs (0,1,2,...)
    UINT attr;                      attributes
    UINT valid;                     1 when to be displayed
    LONG file_counter;              how many files use this
                                    category
    INT nlinks;                     number of links
    CATEG_SYM alinks[10];           category identifiers of
                                    linked categories
    UCHAR filler [128]
} FC_CATEG_REC;
```

During initialization of the file control system, category descriptions (of type FTYP, FDES, CUST, NAME) are read into memory and stored in moveable memory blocks (handles). In the preferred embodiment, data about each category list is gathered in a record structure named COLUMN:

6

```
typedef struct COLUMN {
    RESTYPE arestype;               resource type of categories
                                    in this list (category type)
    INT a_of_nn;                    number of entries in this
                                    column-list
    CATEG_RES **nh_to_categs;       handle to array of category
                                    descriptions (CATEG_RES
                                    structures) in this list
    INT start_cat_vals,
        max_cat_vals;               range of category identifiers
} COLUMN;                           in this list
```

COLUMN entries are stored in an array having the structure:

COLUMN *columns;

File Information Directory Structure

In the preferred embodiment, the FID is a table that can be modeled as having a set of columns labeled by file name, file location (using direct or indirect addressing), creation and/or last update time and date for the file, number of categories associated with the file, and the identifiers of the categories associated with each file by a user.

Other file attributes may be saved in an entry, as desired. For each file that the user may want to locate at a later time, an entry is created in the FID.

FIG. 4 shows an example of a File Information Directory in accordance with the present invention. Each entry has data fields that correspond to the file name (FILE_NAME) 5, file location (FILE_LOC) 6, file creation time (DATE/TIME) 7, number of associated categories (NO_CATEGORIES) 8, and an array of the identifiers of the associated categories (CATEGORY_ARRAY) 9.

When the invention is used under some operating systems, the location of each file comprises a record entry in the FID. However, in one embodiment run under the Apple Macintosh® System 7 operating system, the FID entry can be associated with a corresponding standard "Alias Record". An Alias Record contains internal system information about the file, allowing the operating system to find the file quickly even if the file has been moved and/or renamed. More particularly, the data for each file categorized by a user is stored in two resource records. One of the records is called a Catalog Entry and is stored as a resource of type 'Catalog Record'. A Catalog Entry resource record contains information describing the file and its associated category identifiers. The other record is of the type 'Alias Record', and is an Alias Record enabling rapid location of the file in the system by the operating system Alias Manager. Both resource records referring to the same file have the same resource identifiers. During initialization of the file control system, the 'Catalog Record' records are read into memory and stored in an array and serve the common purposes of displaying and selecting categorized files. The associated 'Alias Record' reside on a system storage unit (e.g., magnetic disk drive) and are read into memory only in order to locate and open a file.

Catalog entries are stored in a random access data base file with the preferred name "FC Catalog". Aliases are stored in the random access data base file with the preferred name "FC Aliases".

The preferred embodiment, the structure of the 'Catalog Record' is as follows:

```
typedef struct FC_CRP_DISK {
    LONG rec_no;                    this record number
    UCHAR fnamep [FNAME_L+1]        file name (Pascal
```

5,544,360

**7**

-continued

| | |
|---|---|
| UNSIGNED LONG INT credat; | String) (alas) creation time/ date of file |
| LONG alias_rec_no | corresponding 'Alias Record' record number |
| INT ncategs; | number of categories describing the file |
| CATEG_SYM acategs [MAX_CAT]; | array of categories identifiers describing the file |
| LONG creator; | |
| LONG type; | |
| UNSIGNED CHAR filler {56}; | |
| } FC_CRP_DISK; | |

CRP records in memory have the same structure. The memory list of CRP records is kept in a moveable block (handle) referred to by:

CRP **hacrp;

Overview of Operation

The invention preferably uses a windows-based graphical user interface for interacting with a user. Such interfaces are common, and include the Macintosh® System 7 operating system from Apple Computer and Microsoft Windows® from Microsoft Corporation.

The invention is activated by running a File Control (FC) Manager program that implements the invention. The FC Manager may be executed ("run") by opening a corresponding file by selecting a menu command and leaving the file open. Other methods known in the art for activating the invention could be used, such as by using a computer mouse to "click" on an icon.

During operation, the FC Manager may be in four states: Inactive, Active, Search Filter Definition, and Categorization. Search Filter Definition is a substate of the Active state. Categorization is generally a substate of the Active state, but in one case, Categorization is a substate of the Inactive state. All states require that the basic data structures described above be initialized. The initialization process initializes all the data structures by allocating memory and reading data from related data files (e.g., the FCT and FID tables, and previously saved "last used" values), in known fashion. After initialization, the FC Manager is set to the Inactive State.

The Active State enables use of the FC Manager to perform such functions as categorizing files, editing the FCT entries, defining a search filter, and locating and opening files.

1. Categorizing Files

Categorization of files in the illustrated embodiment is performed by the user from a Categories Window. In the illustrated embodiment, there are two categorization states—Active and Inactive. In the Active state, a user need only close an uncategorized file to immediately be presented by the FC Manager with the Categories Window. Typically, from within an application, the user will open a file (or, having created a new file, will make the first save to disk), at which time the FC system extension, running as a background process, will detect that action and store the path to the file in common memory. The FC Manager, running as a concurrent process, during "null events" (i.e., periods of inactivity) will retrieve this path from common memory and check the path against a list of already categorized files. If the file has not yet been categorized, the FC Manager will automatically categorize the file with the special category "Uncategorized", and notify the user that there are files to be categorized.

**8**

In the Inactive state, to categorize an open file, the user must affirmatively choose a command from a menu, e.g., a "Categorize" command, to run the FC Manager. When in the Inactive state, the user may open a file specifically for the purpose of selecting categories for that file.

In the preferred embodiment, when the FC Manager is running as a background process, each file being closed is submitted to conditional categorization, which means that only uncategorized files undergo the operation. The file being closed is identified and checked to determine whether it already has an entry in the FID. The file is assumed to be already categorized if there is an entry in the FID with the same creation date and path. In this case, no further action is taken. Otherwise, the FC Manager opens the Categories Window and the user is asked to categorize the file.

When the FC Manager opens the Categories Window, the category names stored in the FCT are displayed, Preferably, the Categories Window presents category descriptions in an organized fashion. It has been found that organizing the category names into columns helps the user to locate and select desired categories. In the illustrated embodiment, the category descriptions are displayed alphabetically in columns, with each column having a heading comprising the category type. Preferably, all category descriptions within a heading are related. However, it is often unclear in which column a given category belongs. Accordingly, the column position of a category is not significant. Columns are used for the convenience of the user in finding relevant categories and for no other reason. Further, any desired display of the category descriptions can be used.

FIG. 5 shows an example of a file manager display in accordance with the present invention. A Categories Window 50 is shown on the right side of the display, with a File Window 52 on the left side. Category types 54 are shown at the top of the Categories Window 50, with category descriptions 56 arrayed in columns below the category types 54. A tally 58 is displayed of the number of files matching selected categories, as further described below.

While the Categories Window 50 is displayed, both the category type headings and the column positions of the category descriptions may be edited by the user. In addition, category types may be added or deleted. Further, category descriptions may be edited or deleted, and new category descriptions may be added while in the Categories Window. A user is preferably warned before deleting a category description or category type. After user confirmation of deletion, the category descriptions is removed from the FCT, and all references in the FID entries to that category description are also removed. Implementation of such editing functions is known in the art of data processing, and simply cause the associated FCT and FID records to be updated.

A category description may be moved from one column (category type) to another column. In the preferred embodiment, moving is accomplished by clicking on the category description with the mouse and dragging and dropping the category description in the new column. In the illustrated embodiment, moving a category description between categegory types changes the category type numeric value, so all associated records in the FID containing the moved category description are checked and modified.

Categories which describe the current file can be selected by the user. This is done, for example, by pointing a computer mouse and "clicking" on each category description to be applied to the file. Preferably, the user may select as many category descriptions as apply to the particular file. After the user has completed category selection for a file, a new entry in the FID is created using the file data associated

5,544,360

| 9 | 10 |

with the file, and all of the selected category descriptions. When the user has completed category selection, the Categories Window may be closed by the user, or the user may select another file for categorization.

In the preferred embodiment, a selected file that has been categorized may be recategorized using the FC Manager by clicking a "Categorize" button 60. This does not require any further file identification, as the file selected by the user contains the information necessary to perform categorization.

If the user adds more category descriptions while the Categories Window is displayed, the FC Manager also creates appropriate new unique identifier entries and the corresponding category description entries in the FCT. In subsequent references to the category descriptions by the FC Manager, these identifiers are used, the corresponding names of the categories being the way the user "connects" with these identifiers. This means that if the user changes the name of a category description, the associated identifier is not changed, thus maintaining the validity of all prior uses of that identifier in the FID.

As an example, assume a file named "jones.mem" located in the "c:\memos" subdirectory and having the file date/time of "01-01-80 01:30" is categorized by a user under the two category descriptions "MEMOS" and "JONES" (see FIG. 3). The FC Manager would make an entry in the FID table (see FIG. 4) as follows (field names are supplied for convenience):

| [FILE_NAME | FILE_LOC | DATE/TIME | NO_CAT. | CAT_ARRAY] |
|---|---|---|---|---|
| jones.mem | c:\memos | 01-01-80 01:30 | 2 | 008, 300 |

The two identifiers "008" and "300" are obtained from the FCT as the identifiers associated with the category descriptions "MEMOS" and "JONES", respectively. If the category description "MEMOS" is later changed to "NOTES", then the FID entry for "jones.mem" would still be linked to the category description "NOTES" by the identifier "008".

In the preferred embodiment, when the user clicks a "Show Usage" command from the Categories Window menu, the FC Manager checks the FID for the number of references to each category description and displays these numbers next to each category description. This feature enables the user to see which category descriptions are frequently used and which are not used at all. The unused or little used category descriptions may then be deleted, and others may be moved around for better accessibility.

If desired, the process of categorizing existing files can be totally or partially automated. After a number of files have been categorized, word patterns in categorized files can be correlated to the category descriptions. This information can be used to automatically assign (or simply suggest) category descriptions to new and existing uncategorized files.

Further, when categorizing a more extensive, broadly based set of files, category descriptions can be grouped into (overlapping) subjects or projects, with a short list of subjects or projects (effectively a top level category set) shown in a separate window (or on a menu). Once a subject or project is chosen, the category descriptions list is shortened to only show those relevant to that subject or project. Taking that idea further, the inventive categorization system can be used recursively. For example, if all the topics in the Library of Congress were categorized, the number of category descriptions needed would be impractically large and unmanageable. If that list of category descriptions were

itself regarded as the data, the invention can be applied to manage a "higher level" category list to manage and access limited portions of the complete category description list. This kind of "multi-level" categorization can be carried to any depth needed. In essence, this approach is another way of organizing lists of category descriptions of the type contemplated by the present invention, adding back some flavor of a hierarchical structure but with the added benefits of precision of input and certainty of existence.

In summary, categorization of a file in accordance with the invention involves the following steps:

1. defining a list of category descriptions;

2. associating one or more category descriptions with a file; and

3. storing a file record containing file identity information, file location information, and the associated category description(s) for the file.

Finding Files

In the process of search and retrieval, the invention overcomes the problem of search filter definition, ensuring that the user defines a filter which will always find at least one file, thus avoiding wasting time in searching for data that cannot be matched. This is achieved in two ways. First, the user is not required to type the key words to search; instead, the user simply chooses the words in random order from pick lists, making mistyping impossible. Second, as the user builds the search filter definition, categories which would find no data are automatically excluded as pick list possibilities.

In order for a user to find one or more files, the Search Filter Definition state is invoked by opening the Categories Window to display the existing category descriptions (see FIG. 5). The user initiates definition of a search filter by, for example, clicking the mouse on a "Set Categories" button. The user then selects the pre-defined category descriptions for the files which the user wants to find. In the illustrated embodiment, this is done in the same way as when categorizing a file: the user clicks the mouse on each applicable category description. After each click, the categories listed in the Categories Window are narrowed to show only those other categories which are used with the selected categories for at least one other file. The category descriptions may be selected in any order. Moreover, those category descriptions whose selection would not change the matching file list are disabled (e.g., shown as "grayed"), as further described below.

The selected categories comprise the user's search filter, which is said to define, or "map", a hybrid folder. The search filter is used to search through the FID table entries for files which match the search filter criteria, and hence come within the specified hybrid folder (that is, the search locates those file records in the FID that have identifiers that match the identifiers of the selected categories).

Any search technique may be used to search the FID table entries. For example, the FID entries may be sequentially searched and each identifier value in the CATEGORY_ARRAY field for each entry compared to the identifiers of the category descriptions selected by the user. In an alternative embodiment, a concordance file indexed by identifier value may be constructed from the FID entries, and a search

5,544,360

11                                                12

conducted through the concordance file to generate a list of FID entries matching all search filter identifier values.

In addition to selecting category descriptions for the search filter, the user preferably may also group the categories, and relate the groups with logical connectors. Of course, a group may include just one category description. Although current implementations provide for an automatic "AND" conjunction between selected categories, other logical operators may be used, such as an explicit "AND" operator, or the "OR" or "NOT" operators. For example, the user may define a search filter of "MEMOS AND JONES". The FID would be searched for all entries having both the identifiers "008" (for "MEMOS") and "300" (for "JONES"). In the example shown in FIG. 4, this search filter would find at least the document "jones.mem". Although other searching mechanisms allow similar searches, none use methods which ensure certainty of existence.

In the preferred embodiment, the Categories Window display indicates how many files match the present search filter. In the illustrated embodiment, the actual number of files in the hybrid folder is displayed. However, the file names in the hybrid folder could also be displayed for this purpose.

It is expected that the FID will be relatively small for most implementations, which allows for very quick searching. In defining a search filter, the hybrid folder to which it maps should contain a sufficiently small number of files to make accessing a particular file easy. Thus, a user would normally continue to select category descriptions until the defined hybrid folder contains no more than a few (e.g., 10) files.

Once FID entries matching the search filter are located, the corresponding file names in the hybrid folder are preferably displayed in a File Window **52** (see FIG. **5**). The user may then select one or more of the displayed file names, which causes the corresponding files to be retrieved from the appropriated storage device and opened (if only one file is in the hybrid folder, selecting the file can be automatic, thereby obviating display of the file name and manual selection). In operation, the selected file names together with their locations from the selected FID entries are passed to the operating system, which opens the files. Because the FID contains the location of all categorized files on disk, it is not necessary to search any other part of the disk, an action which could be very time consuming.

More particularly, in the preferred embodiment, the usual method of opening a file through the FC Manager is double-clicking on the file entry in the File Window. An alternate method is by selecting a file (by clicking on its entry or typing the first few letters of its name) and clicking on an "Open" button. Both methods can allow the opening of multiple files by using multiple selections, as is known in the art. In the preferred embodiment, the opening process consists of the following steps:

1. The selected entry in the File Window points to the corresponding FID entry. Using this pointer, the associated alias record is retrieved.

2. The alias record is passed to the operating system Alias Manager with the order for "Vast resolution". This method is able to find the file very quickly even if it has been renamed and/or moved to another system folder. If the file name has changed, the user is asked to confirm the new name.

3. If a file has been moved (not copied but moved) to another volume after categorization, and the system has been restarted, then one of the system identifiers (the File ID, which unique is within each volume) for the file has been lost. In such cases, the FC manager

performs an exhaustive search of all files on all mounted volumes, searching only for files with the identical creation date and time of the subject file. The user is notified of this action.

4. The result of both searches may be a list of possible matches rather than just a single match (for example, if the file was duplicated and renamed). The FC Manager searches this list looking for files with the same name and creation date/time as in the FID entry. If none are found, then the user is presented with a list of matches with full paths found by the Alias Manager and is asked to select one for opening.

5. When a file is selected, with or without the help of the user, the alias record is checked and updated if necessary to account for any change in file name and/or location.

The result of the search process is a set of standard file identifiers, that is file name, volume reference number, and directory identification. These are passed to the opening routines in the operating system.

In the preferred embodiment, a user is prevented from defining an empty hybrid folder. All category descriptions are disabled which, if added to the search filter defined by the user, would result in no matching files. Disabling of category descriptions may by shown in many ways. For example, disabled category descriptions may be given different display attributes, such as being grayed or dimmed. Alternatively, the names of disabled category descriptions may simply not be displayed. As another alternative, the user may inhibit disabling category description list contraction by selecting a "Full Lists" option.

Determining which category descriptions are to be disabled may be accomplished in several ways. For example, in one embodiment, when no categories are selected, those categories whose identifiers are not used with any files are disabled. When one or more enabled categories are selected, the FID is searched for all files which have

FID entries using all of the identifiers of all of the categories presently selected, and a determination is made as to which other categories are also used on those files. These other categories remain enabled for further selection, but all other categories are disabled.

For example, if a search filter initially includes only the category description "MEMOS", the FC Manager searches the FID for entries containing the identifier corresponding to "MEMOS". Suppose the FC Manager finds three matching files, one being categorized with the categories "MEMOS", "URGENT", and "OFFICE", another being categorized with the categories "MEMOS", "SENT", and "E-MAIL", and the third being categorized with the categories "MEMOS", "SENT", and "LETTERS". The FC Manager creates a union of the set of identifiers for all of the categories found. In this example, the union is "MEMOS", "URGENT", "OFFICE", "SENT", "E-MAIL", and "LETTERS". All categories not in this union are then disabled.

Stated another way, the FID entries are searched for matches to the most recently selected category description in a first step. As a second step, the category description identifiers in the matching FID entries are used to determine which of the remaining category descriptions are not linked by their identifiers to such entries. For example, if a search filter definition initially includes the category description "MEMOS", the FC Manager searches the FID for entries containing the identifier corresponding to "MEMOS". If, for instance, ten entries were located containing the "MEMOS" identifier, then the FC Manager uses the other identifiers in those ten entries to determine which category descriptions to

5,544,360

**13**

disable. For instance, if none of the ten entries contain identifiers for the category descriptions "SALES" or "PATENT", then those two category descriptions would be disabled. The preferred embodiment for disabling unselect-able category descriptions has the effect of making disabling cumulative, so that as the user combines more and more category descriptions in the search filter definition, more and more category descriptions will be disabled. The user chooses from an increasingly limited selection of category descriptions, but will always be assured of having at least one file in the defined hybrid folder.

The ability of the invention to suppress or disable category descriptions that will not result in a match allows definition of a logical operation called "AND PERHAPS". This operation represents a conditional "AND", which means the "AND" conjunctive operation unless with the added search term there would be no match, in which case the term is omitted from the search filter. For example, if the search filter is "MEMOS AND PERHAPS JONES", and "MEMOS" alone would have at least one match, but the addition of "JONES" would cause a non-match, then the "JONES" term is automatically excluded, with a message to the user.

Preferably, the user may also include in the search filter a range of file creation dates and/or times. Preferably, the user may select a predefined range, such as "Last 30 Days". In the illustrated embodiment, the default range is "All Dates". Preferably, those predefined date ranges which would result in no matched files if selected would be disabled. It should be understood that, in general computer systems store file creation date/time as a single relative creation time. Therefore, definition of the date range in the search filter would require a date-to-relative time conversion, as is known in the art. In alternative embodiments, other search criteria may be applied, such as file type, creator type, date last modified, or date last accessed.

To summarize, when a user clicks on a previously unse-lected category description, that category description is highlighted, the category description is added to the search filter definition, the current number of matching files entered in the FID is computed and displayed, each of the remaining category descriptions are evaluated to be displayed or dis-abled, and the new list of category descriptions is displayed in the Category Window. Generally, as each category description is selected, the list of category descriptions shrinks because of the removal of all category descriptions which, if checked further, would give zero matching files. In addition, the number of files matching the specified category descriptions is immediately shown in the File Window. These actions prevent the user from defining a hybrid folder which contains no files.

Deselecting a previously selected category description invokes the same routines, except that the result is generally an increase in the number of listed category descriptions. Widening or narrowing the date filter has a similar effect on the displayed list of category descriptions.

Preferably, the last search filter and hybrid folder are stored on a storage medium for future use. (Alternatively, the last n, or all, prior search filters and hybrid folders may be stored for future use.) Thus, when a user desires to access a file, the user is immediately presented with the hybrid folder as last defined. In many instances, the desired file will be in the last hybrid folder created. To maintain information about the Categories Window and File Window, it is useful to store certain data. In the preferred embodiment, such catalog data is stored in the following record structure:

**14**

```
typedef struct SelectedFiles {
    INT file_match;              number of files matching the
                                 current search filter (i.e., the
                                 number of files to be displayed
                                 in the File Window)
    INT *a_of_match_inds;        pointer to an array containing
                                 indexes to FID entries of files
                                 matching the current search filter
    INT file_marked;             number of files selected by the
                                 user in the File Window
    INT *a_of_marked;            pointer to an array of indexes to
                                 FID entries for the files selected
                                 by user
    INT *a_of_rs;                pointer to an array of row
                                 numbers in the File Window for
                                 selected files (i.e., their
                                 positions relative to the
                                 window)
    INT from_ind;                starting index for file search
                                 in the FID catalog
    INT buttons_on;              indicates whether special File
                                 Window buttons are enabled
} SelectedFiles;
```

All three arrays pointed to by the structure members are dynamic, meaning that their size changes according to current needs.

In summary, finding a file in accordance with the invention involves the following steps:

1. defining a search filter of category descriptions from a pre-defined list of category descriptions;
2. searching the category descriptions of each previously stored file record for a logical match to the category descriptions of the defined search filter;
3. optionally, disabling selection of all category descriptions that would not provide a match to the defined search filter; and
4. displaying at least part of the file identity information of all records having category descriptions that logically match the category descriptions of the defined search filter.

Outdated FID

Various events may impact the integrity of the identifiers in the FID, such as changes to any part of the fully qualified file path (volume or drive, directory chain, and file name). Such events include:

1. Moving the file into another directory.
2. Changing the file name.
3. Renaming the directory containing the file.
4. Moving the directory containing the file into a different directory.
5. Moving the file to another volume (disk).
6. Deleting the file.

When the invention is implemented under the Apple Macintosh® System 7 operating system utilizing Alias Records, events 1, 2, 3, and 4 have no impact because the file ID (used to access files) is part of the Alias Record and is not changed unless the file is moved to another volume. Preferably, if the user attempts to open a file for which the name was changed, the user will be notified of that fact and will be asked to confirm that the file is the correct one.

Events 5 and 6 may cause a delay before the file is found (for event 5) or determined to no longer exist (in which case, an error message is returned). In the illustrated embodiment, when either event 5 or 6 occurs, the Alias Record for the file is updated (after user confirmation) in the FID. In this way, the FID is kept current after each access or attempted access.

On systems that do not provide Alias Records, the FID may store the fully qualified file path (volume or drive,

Exhibit 1, Page 32

5,544,360

**15**

directory chain, and file name) for the file and the file creation date/time. In such a case, a means is preferably provided for finding files which are not at the location indicated in the corresponding FID entry. For example, a search may be made, beginning with the directory closest to the file's original location, using the creation date/time as the search criteria. It has been found that a file with the identical creation date/time (to the nearest second) of the searched file is generally the desired file. However, there may be situations (such as duplicate files) where more than one such file is found. In that case, the file names of the found files are presented to the user, who selects one.

It should be noted that the present invention may be embodied as a replacement for an operating system, thus replacing the hierarchical file structure, or allowing both the hierarchical and the hybrid file structures to be used together. In such an embodiment, features for resolving ambiguities and keeping track of moved or renamed files can be further optimized using the low level access to the disk directories which the operating system controls.

Special Categories

In the preferred embodiment, category descriptions may be further characterized as "standard" or "special". The characterization of a category description may be indicated by setting a flag field in the corresponding FCT record, as provided in the data structure CATEG_RES described above.

The standard category has the attributes as described above. One special category is the "linking" category. A linking category description is linked to other "linked" category descriptions. A linking category provides for the situation when a file is described by one category description, and the file should also be described by a related category description. Such linkage may be indicated in the corresponding CATEG_RES data structure described above, by recording an array of identifiers for linked category descriptions. A category may be both a linking category and a linked category.

As an example of linking and linked categories, a category named "E-Mail" could be defined as a linking category and linked to the category descriptions "Sent", "Received", "Action", "Urgent", and "Reply". Thus, when a file is categorized as "E-Mail", the user would be given an indication (by any convenient method) that the file should also be assigned to one of the linked category descriptions "Sent", "Received", "Action", "Urgent", or "Reply".

Preferably, when the user selects a linking category, the user is reminded to also select from the corresponding linked category descriptions. The linked categories may be indicated in the Categories Window using a distinctive style such as underline or bold, or using a check mark. Alternatively, a dialogue box may be displayed containing the linked category descriptions. If the user fails to select at least one of the linked category descriptions, a warning dialogue is preferably displayed.

If a user desires to delete a linking category, the linked categories are preferably indicated. The user is preferably given the opportunity to select linked categories to delete.

Another special category type can be called "encrypted". An encrypted category requires a password which is used to initiate encryption of all files which have that category. Encrypted files may not be accessed except by first entering the necessary passwords. For example, the user would be asked to enter the password for each such category description selected when creating a search filter. Since the file contents are encrypted, access without the necessary passwords would only reveal unintelligible codes.

**16**

Since files may be assigned to multiple category descriptions, more than one password may be required to access a file. However, once each password is entered, all files using that password are made accessible through the FC Manager. This method of encrypting files has an advantage over current methods in that once a password is entered, the user may access any number of files without further needing a password. Current methods of protecting individual files usually require entry of a password each time the file needs to be opened.

Many other implementations of these ideas are possible in electronic network information management, electronic mail, or any other data management systems. For example, in a large office or on a public or private electronic network, communication between people can be difficult because of the very large number of people trying to communicate. After a certain point, there is an information overload and it is too time consuming to try to search through all the messages for the few of interest. Using the invention, a category description list could be defined for all possible topics (with constant updating by the network administrator and/or by the users). Each user could then use this list of category descriptions to both post messages and search for messages on topics of interest to the user. The user could also set up sets of search filters for particularly important topics. If any messages were to be posted whose topics matched those search filters, they would be immediately sent to the user.

Accordingly, the present invention provides a method for accessing files which has intuitive access by user-defined topics. More particularly, the invention provides: easy access to a large number of files and to files having overlapping categories; simple access to files stored in a hierarchical file system without the necessity of sorting through multiple levels; access to files using predefined categories descriptive of the contents of the files; access to files which permits a user to create a search filter of categories of files using precise category names to which the files belong, with the assurance that the filter will always find some files (although possibly deleted); and a method of accessing files which is unaffected by changes in file contents.

A number of embodiments of the present invention have been described. Nevertheless, it will be understood that various modifications may be made without departing from the spirit and scope of the invention. For example, although the above description has been made with respect to a single computer system, that term is meant to include distributed data storage environments, such as networked computers. Further, although the above description has contemplated that the "user" is a person, the invention can be readily adapted to interact with another computer as the "user". Accordingly, it is to be understood that the invention is not to be limited by the specific illustrated embodiment, but only by the scope of the appended claims.

We claim:

1. A method for accessing files in a data storage system of a computer system having means for reading and writing data from the data storage system, displaying information, and accepting user input, the method comprising the steps of:

(a) initially creating in the computer system a category description table containing a plurality of category descriptions, each category description comprising a descriptive name, the category descriptions having no predefined hierarchical relationship with such list or each other;

(b) thereafter creating in the computer system a file information directory comprising at least one entry

5,544,360

**17**

corresponding to a file on the data storage system, each entry comprising at least a unique file identifier for the corresponding file, and a set of category descriptions selected from the category description table; and

(c) thereafter creating in the computer system a search filter comprising a set of category descriptions, wherein for each category description in the search filter there is guaranteed to be at least one entry in the file information directory having a set of category descriptions matching the set of category descriptions of the search filter.

**2.** A method for accessing files in accordance with claim **1,** wherein each category description comprises a user defined category name and a unique category description identifier created by the computer system.

**3.** A method for accessing files in accordance with claim **2,** wherein each category description further comprises a category type designation.

**4.** A method for accessing files in accordance with claim **2,** wherein the step of creating a category description table comprises the steps of:

(1) accepting user input defining a new category description;

(2) displaying the new category description;

(3) creating a unique category description identifier associated with the new category description; and

(4) storing the new category description and unique category description identifier in the category description table.

**5.** A method for accessing files in accordance with claim **4,** wherein the step of creating a file information directory comprises the steps of:

(1) accepting user input selecting a file;

(2) displaying each category description in the category description table;

(3) accepting user input associating the selected file with at least one category description selected by the user from the displayed category descriptions;

(4) creating a new entry in the file information directory;

(5) storing in the new entry the file identifier of the selected file; and

(6) storing in the new entry the category description identifier of each of the selected category descriptions.

**6.** A method for accessing files in accordance with claim **5,** wherein the data storage system further includes a file name for each file and the step of selecting a file comprises the steps of:

(1) displaying at least one file name; and

(2) accepting a user selected of a file from the displayed file names.

**7.** A method for accessing files in accordance with claim **1,** wherein the step of creating a search filter comprises the steps of:

(1) disabling category descriptions which if added to the search filter would not match the category descriptions of at least one entry in the file information directory;

(2) accepting user input selecting at least one category description as a component of the search filter.

**8.** A method for accessing files in accordance with claim **7,** wherein disabled category descriptions are indicated by means of a unique display attribute.

**9.** A method for accessing files in accordance with claim **7,** wherein the step of creating a search filter further comprises the steps of;

**18**

(1) relating at least two selected category descriptions with logical operations.

**10.** A method for accessing files in accordance with claim **7,** wherein the data storage system includes the time of creation of each file, and the step of creating a search filter further comprises the step of:

(1) accepting user input defining a time range to limit matching to only those entries in the file information directory having creation times in the selected time range.

**11.** A method for accessing files in accordance with claim **7,** wherein each category description comprises a user defined category description name and a unique category description identifier created by the computer system, and further including the step of displaying the name of each file in the file information directory having category description identifiers matching the category description identifiers of the category descriptions in the search filter.

**12.** A method for accessing files in accordance with claim **11,** further comprising the steps of:

(1) selecting one of the displayed file names; and

(2) opening the file corresponding to the selected file name.

**13.** A method for accessing files in accordance with claim **12,** wherein the step of selecting a file name comprises the step of:

(1) accepting user input selecting a file from the displayed file names.

**14.** A method for accessing files in accordance with claim **12** wherein the step of opening a file comprises the step of:

(1) testing if only one file name is displayed, and if so, then opening the file corresponding to that file name.

**15.** A system for accessing files in a data storage system comprising:

(a) a plurality of files in a data storage system;

(b) a plurality of user-defined category descriptions, each category description comprising a descriptive name, the category descriptions having no predefined hierarchical relationship with such list or each other;

(c) file association means for associating at least one file with at least one category description selected from the plurality of previously defined category descriptions;

(d) category description addition means for adding one or more additional category descriptions to the plurality of user-defined category descriptions; and

(e) category linking means for linking at least one linking category description to at least one linked category description, such that if a specific file is associated with a linking category description, the user must also associate that specific file with at least one of the linked category descriptions corresponding to the linking category description.

**16.** A system for accessing files in a data storage system as set forth in claim **15,** further including a linking reminder activated upon associating a specific file with a linking category description, such that the linking reminder provides an indication to the user that the user must associate that file with at least one of the linked category descriptions corresponding to the linking category description.

**17.** A system for accessing files in a data storage system as set forth in claim **15,** further including password-controlled file encryption means for encrypting at least one of the plurality of files, such that if a specific file is encrypted, associating that file with a category requires provision by the user of a password, and any access to that file requires provision by the user of a password.

5,544,360

| 19 | 20 |

**18.** A system for accessing files in a data storage system of a computer system having means for reading and writing data from the data storage system, displaying information, and accepting user input, wherein each file located on the data storage system has a file name, the system comprising:

(a) means for initially defining in the computer system at least one list having a plurality of category descriptions, each category description comprising a descriptive name, the category descriptions having no predefined hierarchical relationship with such list or each other;

(b) means for thereafter accepting user input associating with a file at least one category description from at least one defined list;

(c) means for storing in the data storage system a file record containing at least the file name, file location information, and the associated category descriptions for the file;

(d) means for displaying from each defined list, as selectable items, only those category descriptions associated with at least one file;

(e) means for accepting user positional input defining a search filter of at least one category description selected from at least one displayed defined list;

(f) means for automatically disabling, in the computer system, selectability of all other category descriptions in each displayed list that do not have associated files which are also associated with the category descriptions of the defined search filter;

(g) means for searching in the computer system the category descriptions of each stored file record for a logical match to the category descriptions of the defined search filter;

(h) means for displaying the file names of all file records having category descriptions that logically match each category description of the defined search filter.

**19.** The system for accessing files of claim **18**, further including:

(a) means for accepting user input selecting at least one file from the displayed file names;

(b) means for accessing each selected file on the data storage system using the file location information from the file record associated with each corresponding selected file.

**20.** A method for accessing files in a data storage system of a computer system having means for reading and writing data from the data storage system, displaying information, and accepting user input, wherein each file located on the data storage system has a file name, the method comprising the steps of:

(a) initially defining in the computer system at least one list having a plurality of category descriptions, each category description comprising a descriptive name, the category descriptions having no predefined hierarchical relationship with such list or each other;

(b) thereafter accepting user input associating with a file at least one category description from at least one defined list;

(c) storing in the data storage system a file record containing at least the file name, file location information, and the associated category descriptions for the file;

(d) displaying from each defined list, as selectable items, only those category descriptions associated with at least one file;

(e) accepting user positional input defining a search filter of at least one category description selected from at least one displayed defined list;

(f) automatically disabling, in the computer system, selectability of all other category descriptions in each displayed list that do not have associated files which are also associated with the category descriptions of the defined search filter;

(g) searching in the computer system the category descriptions of each stored file record for a logical match to the category descriptions of the defined search filter;

(h) displaying the file names of all file records having category descriptions that logically match each category description of the defined search filter.

**21.** The method for accessing files of claim **20**, further including the steps of:

(a) accepting user input selecting at least one file from the displayed file names;

(b) accessing each selected file on the data storage system using the file location information from the file record associated with each corresponding selected file.

* * * * *

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,**
**AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 12,903 words, as determined by the word-count

function of Microsoft Word 2010, excluding the parts of the brief exempted by

Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word 2010 in

14-point Times New Roman font.

                                   /s/ *Daniel L. Geyser*
                                   Daniel L. Geyser
                                   MCKOOL SMITH, P.C.
                                   300 Crescent Court, Suite 1500
                                   Dallas, TX  75201
                                   Tel.:  (214) 978-4014
                                   Fax:  (214) 978-4044
                                   *dgeyser@mckoolsmith.com*

                                   *Counsel for Plaintiff-Appellant*
                                   *SpeedTrack, Inc.*

August 11, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2014, an electronic copy of the foregoing Opening Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Tel.: (214) 978-4014
Fax: (214) 978-4044
*dgeyser@mckoolsmith.com*

August 11, 2014